[No. B165380. Second Dist., Div. Three. Sept. 9, 2004.]

AMITIS MOTEVALLI, Plaintiff and Appellant, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

98

## Counsel

Law Offices of Hadsell & Stormer, Dan Stormer, Anne Richardson and Cornelia Dai for Plaintiff and Appellant.

Law Office of Lawrence B. Trygstad, Trygstad, Schwab & Trygstad, Richard J. Schwab and Angelo L. Rosa for United Teachers Los Angeles as Amicus Curiae on behalf of Plaintiff and Appellant.

Strumwasser & Woocher, Michael J. Strumwasser, Fredric D. Woocher, Johanna R. Shargel, Lamar W. Baker and Becky L. Monroe for Defendant and Appellant.

## OPINION

**KLEIN, P. J.**—Plaintiff and appellant Amitis Motevalli (Motevalli) appeals a judgment in favor of defendant and respondent Los Angeles Unified School District (the District) entered following a grant of judgment notwithstanding the verdict (JNOV).

The District has filed a protective cross-appeal from the original judgment.

The issues presented are whether the trial court properly granted summary adjudication in favor of the District on Motevalli's *Tameny* claim,[1] and whether it properly granted JNOV in favor of the District on Motevalli's cause of action for damages for violation of her free speech rights under the California Constitution.

■ Motevalli was an emergency-credentialed teacher who was hired by the District for a specific period of time. The District elected not to renew Motevalli's contract. The nonrenewal is not actionable under *Tameny, supra,* 27 Cal.3d 167, because no cause of action exists for tortious nonrenewal of an employment contract in violation of public policy. (*Daly v. Exxon Corp.* (1997) 55 Cal.App.4th 39, 45–46 [63 Cal.Rptr.2d 727].) Further, Motevalli cannot maintain an action for damages for deprivation of the right to free speech under article I, section 2, subdivision (a), of the California Constitution (hereafter, article I, section 2 (a)). (*Degrassi v. Cook* (2002) 29 Cal.4th 333, 335 [127 Cal.Rptr.2d 508, 58 P.3d 360] (*Degrassi*). Therefore, the judgment in favor of the District is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

*1. The District Hires Motevalli To Teach Under an Emergency Credential.*

Motevalli obtained a bachelor's degree in 1995 and a master's degree in fine art in 1998. In May 1999, the District hired Motevalli for a position teaching art and art history at Locke High School (Locke) for the 1999–2000 school year. She completed a three-day new teacher training academy and began work on September 6, 1999, under an "emergency credential."

The employment relationship between Motevalli and the District was formalized in a one-page agreement captioned "Offer of Contract Employment as a Provisional or University Intern Teacher," signed by the parties.

---

[1] *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330] (*Tameny*).

The agreement stated Motevalli's contract status was "provisional" and that the term of service was to commence "on or before 10–18–99 and ending 06–30–00." The agreement stated it was "subject to provisions of the District and United Teachers-Los Angeles Collective Bargaining Agreement, all rules and regulations of the Board of Education, *and all provisions of laws and regulations of the State of California.*" (Italics added.) Thus, the contract was expressly subject to the Education Code.

Paragraph 5 provided: "I understand that if this offer is for a provisional contract, service under an emergency permit does not count toward permanent status (tenure) with the District; I also understand that this contract can be cancelled at anytime without cause at the discretion of the District."

For the subsequent school year, 2000–2001, Motevalli was offered and accepted a successive contract with the same terms and conditions, except that under the second contract, the term of service was to commence "on or before 11–13–00 and ending 06–30–01."

2. *Events During the 2000–2001 School Year Leading up To the District's Decision Not To Renew Motevalli's Contract.*

Since 1993, the District has required its secondary schools to conduct regular random weapons searches. The random weapons search policy is intended to deter the bringing of weapons onto school grounds and thereby to reduce the potential for violent incidents.

Pursuant to the weapons search policy, on December 13, 2000, school officials selected Motevalli's classroom for a weapons search. Motevalli refused to allow the scan team to conduct a search, stated she believed the search was illegal under the Fourth Amendment, and asked the scan team to come back another time.

The next day, Annie L. Webb (Webb), the principal at Locke, sent Motevalli a memorandum admonishing her that her refusal to cooperate with the scan team was contrary to District policy and could lead to disciplinary action in the form of a Notice of Unsatisfactory Act (Unsat) with a possible recommendation for suspension without pay. Under District practice, a provisional teacher who receives an Unsat notice is not offered a contract for the next academic year.

On January 23, 2001, Motevalli's classroom was selected for another random weapons search. Motevalli again told the scan team "[her] class was busy and that in [her] view the [F]ourth [A]mendment would be violated." Webb arrived and summoned Motevalli to her office. Before leaving the

classroom, Motevalli told her students "You know what to do." Motevalli previously had instructed her students that in the event of a weapons search, unless they were on probation they were entitled to refuse to cooperate. Most of the students then left the room and the search did not proceed.

Immediately after this incident, Webb held a conference with Motevalli, at which Webb emphasized that "safety comes first" and that as an employee of the District, Motevalli was required to enforce District policy, regardless of her personal beliefs. Webb then issued a conference summary memorandum to Motevalli which concluded: "I will continue to investigate the matter and this may result in disciplinary action in the form of an Unsatisfactory Act and a suspension without pay."

On April 2, 2001, Webb held a conference with Motevalli, at which time Motevalli was issued an Unsat notice. The notice charged that on January 23, 2001, Motevalli "failed to follow an administrative directive when she failed to allow the school's weapon scanning team to enter her room to scan her students" and that she "used poor judgment and demonstrated little or no regard for the safety of students by: [¶] Yelling, 'You know what to do!' [w]hen the scanning team entered the classroom. [¶] Previously instructing her students to begin shouting and walking out of the classroom if the scanning team came in. [¶] Allowing the students to leave the classroom without taking any action and failing to provide any supervision. [¶] Failing to follow school and administrative policy regarding the random scanning of students for weapons."

The Unsat notice, which was signed by Webb, recommended Motevalli be dismissed from the District. However, Motevalli was not dismissed and she was permitted to serve out the full term of her contract. Contemporaneous with the Unsat notice, Motevalli also was given notice of a five-day suspension, based on the same charges as the Unsat. Motevalli appealed the suspension notice, the appeal was not resolved before the contract expired, and the suspension was not served.

Motevalli worked at Locke through June 22, 2001. Her contract was not renewed for the 2001–2002 school year.

### 3. Proceedings.

#### a. Pleadings.

On July 12, 2001, three weeks after Motevalli's last day at Locke, she commenced this action against the District in the superior court, bringing claims for (1) violation of 42 United States Code section 1983 (section 1983); (2)

wrongful termination in violation of public policy (*Tameny, supra*, 27 Cal.3d 167); (3) violation of free speech under the California Constitution; (4) taxpayer claim (Code Civ. Proc., § 526a); (5) negligent supervision; and (6) intentional infliction of emotional distress.

The District had the case removed to federal court, which dismissed the section 1983 claim against the District on the ground of sovereign immunity under the Eleventh Amendment, and remanded the state claims to state court. On remand, the trial court granted judgment on the pleadings in favor of the District on the last three causes of action. At that juncture, the only remaining causes of action were the second and third causes of action, namely, the *Tameny* claim and the free speech claim under the California Constitution.

In this regard, Motevalli pled the District enforces a "custom and policy of conducting suspicionless pat-downs of students while they are in class," that the policy was "disruptive and takes valuable time away from learning" and "violate[s] the students' rights to privacy." Further, "Locke officials arbitrarily select students for bag inspections without any reasonable suspicion of weapons possession." Motevalli alleged she "spoke up when she believed that students were being treated unfairly by the police," and that she was also "very vocal about Locke's need for more teachers."

These factual allegations were the basis for Motevalli's cause of action for tortious discharge in violation of public policy, wherein she pled she was terminated for engaging in speech protected by the First Amendment.

These allegations also served as the basis for the state constitutional claim, wherein Motevalli sought damages for violation of her right to free speech under the California Constitution.

### b. *The Tameny Claim Is Eliminated on Summary Adjudication.*

On August 9, 2002, the District moved for summary judgment. The District contended there was no admissible evidence to support Motevalli's claim the decision not to renew her contract was retaliatory in any way; the evidence showed Motevalli's contract was not renewed because she was insubordinate and interfered with the District's long-standing safety program; Motevalli, as an untenured, emergency-credentialed teacher, had no property right in continued employment with the District; the unlawful search claim was meritless; Motevalli had no standing to raise her students' privacy rights; and to the extent Motevalli claimed she was harassed for criticizing Locke's policies and practices, such speech falls outside the protection of the California Constitution.

The District did not, in the alternative, move for summary adjudication.

However, the trial court granted summary adjudication as to the *Tameny* claim, ruling: "[Motevalli] can not make a *Tameny* claim for wrongful termination in violation of public policy because she was not terminated. Defendant had a right not to renew her contract, which is what it did. Since plaintiff was not fired, discharged, or terminated, she can not claim wrongful termination in violation of public policy. *Daly v. Exxon Corp.*[*, supra,*] 55 Cal.App.4th [at page] 45. Additionally, there is no cause of action for 'tortious nonrenewal of an employment contract in violation of public policy.' *Id.* at 45–46."[2]

The trial court denied summary adjudication on the state constitutional claim on the ground that *Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813] (*Laguna*) allows a tort action for damages for violation of the free expression clause of article I, section 2, of the California Constitution, and although the evidence strongly suggested Motevalli's insubordination, not her exercise of free speech, was the principal motive in her nonrenewal, the court could not decide this issue as a matter of law and the issue was one for the jury.

### c. *Trial on the State Constitutional Claim; Jury Returns a Verdict for Motevalli.*

On October 1, 2002, the matter went to trial on Motevalli's claim under article I, section 2 of the California Constitution. The jury returned a special verdict for Motevalli. It found, inter alia, she was engaged in legally protected activity, she was subjected to an adverse employment action, the protected activity was a substantial or motivating factor in the District's adverse employment action and the District would not have reached the same decision to take adverse employment action against Motevalli had she not engaged in protected activity. The jury awarded Motevalli $425,000, consisting of $137,500 in economic damages and $287,500 in noneconomic damages. Judgment on the verdict was entered on November 19, 2002.

### d. *Posttrial Proceedings.*

On December 4, 2002, the District filed motions for JNOV and for new trial.

---

[2] Although the trial court resolved the *Tameny* claim on the ground there was no wrongful termination in that the District merely elected not to renew Motevalli's contract, the record reflects said ground was not raised in the District's moving or reply papers below. This procedural issue is addressed in part 2b. of the Discussion, *post.*

The District raised two issues on its motion for JNOV. First, on November 27, 2002, the California Supreme Court issued its decision in *Degrassi, supra,* 29 Cal.4th 333, which disallowed a claim for damages for an alleged violation of the free speech clause of article I, section 2 of the California Constitution. In addition, Motevalli failed to present substantial evidence the nonrenewal of her contract was impermissibly motivated, and to the contrary, the unrefuted evidence established the District would have reached the same decision regardless of Motevalli's engaging in constitutionally protected activity.

In its concurrent motion for new trial, the District raised the grounds of instructional error, evidentiary error, excessiveness of damages and insufficiency of the evidence to justify the verdict.

The motions were heard and taken under submission. On January 21, 2003, the trial court granted the District's JNOV motion. It found substantial evidence to support the jury's determination the District would not have reached the same decision not to renew Motevalli's contract had Motevalli not engaged in protected activity. Nonetheless, *Degrassi, supra,* 29 Cal.4th 333, was controlling, *Degrassi* applied retroactively to this case, and under *Degrassi,* Motevalli had no claim for damages for violation of the right to free speech under the California Constitution.

The trial court denied the District's motion for new trial.

On February 4, 2003, after vacating the judgment on special verdict, the trial court entered a new judgment in favor of the District.

Motevalli filed a timely notice of appeal from the February 4, 2003 judgment. The District cross-appealed from the November 19, 2002 judgment.

## CONTENTIONS

Motevalli contends the trial court erred in granting summary adjudication on her *Tameny* claim and in granting JNOV in favor of the District pursuant to *Degrassi, supra,* 29 Cal.4th 333, on her claim for damages under the California Constitution.

The District contends that if this court reverses the JNOV, it should also reverse the order denying the District's motion for new trial because the verdict was the product of prejudicial evidentiary and instructional error.

## DISCUSSION

*1. As a Preliminary Matter, Motevalli Was a Probationary Teacher With No Entitlement To a Renewal of Her Contract.*

a. *Introduction.*

■ Although Motevalli's *Tameny* claim and her cause of action for damages for violation of her right to free speech are nonstatutory claims, those issues cannot be resolved in a vacuum. Further, the employment relationship between Motevalli and the District cannot be determined solely by reference to the written contract because contract terms cannot supercede statutory requirements. (*Zalac v. Governing Bd. of Ferndale Unified School Dist.* (2002) 98 Cal.App.4th 838, 849 [120 Cal.Rptr.2d 615]; *Fine v. Los Angeles Unified School Dist.* (2004) 116 Cal.App.4th 1070, 1077, fn. 7 [10 Cal.Rptr.3d 876].) ■ "Certificated employees [teachers] must be classi-fied in accordance with the provisions of the Education Code." (*Zalac, supra,* at p. 849; accord, *Fine, supra,* at p. 1077, fn. 7.)[3] The classification is pivotal because a teacher's classification "governs the level of statutory job protec-tion the teacher enjoys and controls the level of procedural protections that apply if he or she is not reelected." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 917 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

Therefore, before discussing the specifics of the contentions raised by Motevalli relating to her causes of action, it is necessary as a preliminary matter to determine Motevalli's classification under the Education Code and the nature of the employment relationship.

b. *General Principles: The Four Possible Classifications.*

As the Supreme Court explained in *Kavanaugh v. West Sonoma County Union High School Dist., supra,* 29 Cal.4th at pages 916–917, " 'The Education Code establishes four possible classifications for certificated em-ployees: permanent, probationary, substitute and temporary.' [Citation.] The code authorizes the governing boards of school districts to hire, classify, promote and dismiss certificated employees (i.e., teachers) (see § 44831), but establishes a complex and somewhat rigid scheme to govern a board's

---

[3] "The term 'certificated person' refers to a person who holds one or more documents such as a certificate, a credential, or a life diploma, which singly or in combination license the holder to engage in the school service designated in the document or documents." (Ed. Code, § 44006.)

All further statutory references are to the Education Code, unless otherwise indicated.

exercise of its decisionmaking power." (See also Cal. Code Regs., tit. 5, § 5501, subd. (c), setting forth the four classifications.)

### c. Motevalli's Status as "Provisional" Denotes Her Licensure Status, Not Her Employment Status; Her Status Was Not Temporary.

▮ The written contract indicated Motevalli's contract status was "provisional." However, as noted in *Fine v. Los Angeles Unified School Dist., supra,* 116 Cal.App.4th 1070, the Education Code does not classify teachers as " 'provisional.' " (*Id.,* at p. 1077, fn. 6.) The Education Code "refers only to service by a person 'under a provisional credential.' (§ 44911.)" (*Fine, supra,* at p. 1077, fn. 6.) Therefore, the contract's characterization of Motevalli as provisional denoted her licensure status, not her employment classification.

Thus, although the word "provisional" means "provided for a temporary need" (Webster's Third New Internat. Dict. (1986) p. 1827, col. 3), Motevalli's classification under the Education Code was *not* that of a temporary teacher. (See §§ 44919, 44920, 44921, relating to temporary status.) The parties agree Motevalli was not a temporary teacher.

### d. Motevalli's Employment Classification Was Probationary by Operation of Law.

▮ As noted in *California Teachers Assn. v. Governing Bd. of Golden Valley Unified School Dist.* (2002) 98 Cal.App.4th 369, 377 [119 Cal.Rptr.2d 642] (*Golden Valley*), "no statutory provision explicitly delineates how teachers with emergency permits should be classified."[4] Therefore, we resort to section 44915, which provides: "Governing boards of school districts shall classify as probationary employees, those persons employed in positions requiring certification qualifications for the school year, who have not been classified as permanent employees or as substitute employees."[5] By statute, "probationary" is the default category for those persons not classified as permanent or substitute teachers. (§ 44915.)

---

[4] In *Golden Valley,* the teacher, who held an emergency permit, was *expressly* classified under the written contract as a probationary employee. (*Golden Valley, supra,* 98 Cal.App.4th at pp. 372–373.) The trial court ruled a teacher with only an emergency permit may not be classified as a probationary employee. (*Id.,* at p. 372.) The reviewing court reversed, holding the classification was proper. (*Ibid.*)

[5] As noted in *Fine v. Los Angeles Unified School Dist., supra,* 116 Cal.App.4th at page 1077, footnote 6, the classification of temporary employees is addressed in other Code sections.

In *Fine,* the plaintiff worked as an elementary teacher under an emergency permit. (*Fine, supra,* 116 Cal.App.4th at p. 1073.) The reviewing court found that pursuant to section 44915, "while [the plaintiff] served under her emergency permit, she was apparently entitled to classification as a probationary employee, *for purposes other than attaining tenure.*" (*Fine, supra,* at p. 1077 [10 Cal.Rptr.3d 876], fn. 6, italics added.)[6]

Here, while Motevalli was serving under her emergency permit, because she was not classified as a temporary, permanent or substitute teacher, we conclude her classification was probationary by operation of law. (§ 44915.)

> *e. Irrespective of Motevalli's Status as a Probationary Teacher, Her Term of Service Was Set by the Contract and Expired June 30, 2001; Although Not One of Motevalli's Contentions, She Was Not Deemed Automatically Reelected in the Absence of a March 15 Notice Because Section 44929.21, subdivision (b) is Inapplicable to a Teacher Employed Under an Emergency Permit; Her Employment Was Not Terminated—It Simply Was Not Renewed.*

■ Given Motevalli's status as a probationary employee, the question arises as to whether that status gave her certain statutory rights with respect to an automatic renewal of her contract. This issue relates to Motevalli's *Tameny* claim, because, as explained in part 2 of the Discussion, for purposes of stating a *Tameny* claim a distinction exists between a termination of employment and a nonrenewal of an expired employment contract. (*Daly v. Exxon Corp., supra,* 55 Cal.App.4th at p. 45.)

Under section 44929.21, subdivision (b), unless a probationary teacher is notified of nonreelection by March 15 of his or her second consecutive school year, that teacher is automatically deemed reelected and is entitled to classification as a permanent employee at the commencement of the succeeding school year.[7]

---

[6] This limitation is based on section 44911, which states in pertinent part: "Service by a person under a provisional credential shall not be included in computing the service required as a prerequisite to attainment of, or eligibility to, classification as a permanent employee of a school district."

[7] Section 44929.21 provides in relevant part at subdivision (b): "Every employee of a school district . . . who, after having been employed by the district for two complete consecutive school years in a position or positions requiring certification qualifications, is reelected for the next succeeding school year to a position requiring certification qualifications *shall, at the commencement of the succeeding school year be classified as and become a permanent employee of the district.* [¶] The governing board shall notify the employee, on or before March 15 of the employee's second complete consecutive school year of employment by the district in a position or positions requiring certification qualifications, of the decision to reelect

■ Section 44929.21, subdivision (b), clearly is inapplicable to a probationary teacher employed under an *emergency credential.* Notwithstanding any other rights a teacher with a provisional credential may have, under the statutory scheme, "[s]ervice by a person under a provisional credential shall not be included in computing the service required as a prerequisite to attainment of, or eligibility to, classification as a permanent employee of a school district." (§ 44911.) Emergency teaching credentials, such as the emergency permit issued to Motevalli, are "provisional credentials" within the meaning of section 44911. (*Summerfield v. Windsor Unified School Dist.* (2002) 95 Cal.App.4th 1026, 1032 [116 Cal.Rptr.2d 233].) A probationary teacher employed under an emergency credential cannot ascend to permanent status merely through the passage of time. (§ 44911.)

Therefore, irrespective of Motevalli's status as a probationary employee, because she was employed under an emergency credential, the District was *not* required to notify her by March 15 of her second year of employment of her nonrenewal for the ensuing school year (§ 44929.21, subd. (b)) for her employment to terminate.

### f. *Preliminary Conclusion.*

Having considered the operative employment contract in light of the Education Code to determine Motevalli's appropriate classification, we conclude she was a probationary teacher, albeit working under an emergency credential. Given that status, the District properly notified Motevalli at the end of the 2000–2001 school year that her contract, with an expiration date of June 30, 2001, would not be renewed.

Pursuant to the statutory scheme, as well as the language of the employment contract, the District had the right not to renew Motevalli's contract for the succeeding school year. The District exercised that right. Against this backdrop, we now turn to the issues presented by Motevalli's *Tameny* and free speech claims.

---

or not reelect the employee for the next succeeding school year to the position. *In the event that the governing board does not give notice pursuant to this section on or before March 15, the employee shall be deemed reelected for the next succeeding school year."* (Italics added.)

*2. An Alleged Wrongful Nonrenewal of an Employment Contract Does Not Give Rise to a Claim of Tortious Nonrenewal in Violation of Public Policy; Such a Cause of Action is Not Recognized.*

*a. Mere Nonrenewal of Motevalli's Contract Did Not Constitute an Adverse Employment Action for Purposes of Stating a Tameny Claim.*

■ The seminal case of *Tameny, supra,* 27 Cal.3d 167, recognized a cause of action in tort where an employee is wrongfully discharged in contravention of fundamental public policy.

Subsequent case law had held adverse employment action short of a termination may give rise to a *Tameny* claim. In *Garcia v. Rockwell Internat. Corp.* (1986) 187 Cal.App.3d 1556 [232 Cal.Rptr. 490], the employee brought a *Tameny* claim, alleging he was wrongfully suspended without pay and demoted in retaliation for revealing his employer's misconduct to NASA's inspector general. (*Id.,* at pp. 1558, 1560.) The employer moved for summary judgment, contending a tort claim did not lie because a *Tameny* cause of action arises only after a retaliatory firing or termination of employment. (*Id.,* at p. 1560.) The trial court granted the employer's motion. (*Id.,* at p. 1558.)

The reviewing court reversed. It observed: "[The employer] claims application of the *Tameny* rationale to a claim of retaliatory disciplinary action, falling short of an actual discharge, presents a case of first impression in California, and that appears to be correct. Neither counsel's nor our independent research has revealed a case involving a suspension without pay or other disciplinary action, other than discharge. However, we see no reason why the rationale of *Tameny*[, *supra,* 27 Cal.3d 167] should not be applicable in a case where an employee is wrongfully (tortiously) disciplined and suffers damage as a result" (*Garcia, supra,* 187 Cal.App.3d at p. 1561), even though "the ultimate sanction of discharge has not been imposed." (*Id.,* at p. 1562.)

In the instant case, the issue presented is whether the District's *nonrenewal* of Motevalli's employment contract constituted a sufficient adverse employment action for purposes of maintaining a *Tameny* claim. We agree with the trial court that *Daly v. Exxon Corp., supra,* 55 Cal. App.4th 39 [63 Cal.Rptr.2d 727], is dispositive.

In *Daly,* the plaintiff contended she had pled a *Tameny* claim for wrongful termination in violation of public policy. The reviewing court rejected the argument on the ground the plaintiff was not fired, discharged, or terminated. (*Daly, supra,* 55 Cal.App.4th at p. 45.) "The contract was for a one-year term; it stated: 'Exxon shall have the option in its sole discretion of

terminating this AGREEMENT without cause at any time by giving ten (10) days prior written notice thereof.' . . . The employment contract was for a fixed term and expired May 1, 1992. Under a fixed-term contract, the 'employment is terminated by . . . [¶] . . . [e]xpiration of its appointed term.' ([Lab. Code] § 2920, subd. (a).) [¶] Had Exxon fired, discharged, or terminated Daly before the contract expired because she complained about unsafe working conditions, she could have sued for wrongful discharge in addition to statutory damages. [Citation.]" (*Daly, supra,* 55 Cal.App.4th at p. 45.) However, the plaintiff could not sue for tort damages where the employment contract was for a fixed term and expired. (*Ibid.*)

*Daly* also noted the plaintiff's use of the term "wrongful termination" was a misnomer in that there was no termination, only a nonrenewal of the employment contract. (*Daly, supra,* 55 Cal.App.4th at p. 45.) *Daly* further held the plaintiff was not entitled to leave to amend "to allege a new cause of action for what she labels 'tortious nonrenewal of an employment contract in violation of public policy.' 'We are unaware of any case, and [plaintiff] presents none, in which an employer was held liable in tort for refusing to renew an employment contract that had expired by its own terms.' [Citation.]" (*Id.,* at pp. 45–46.)

■ *Daly* is directly on point. The District did not terminate Motevalli— she was a probationary teacher, working under an emergency credential, whose contract was not renewed. Absent a termination, there is no cause of action for wrongful termination in violation of public policy. Further, Motevalli was incapable of amending her complaint to allege a new cause of action for tortious nonrenewal of her employment contract in violation of public policy because no such cause of action is recognized. (*Daly, supra,* 55 Cal.App.4th at pp. 45–46.)

Accordingly, we uphold the trial court's grant of summary adjudication on Motevalli's *Tameny* claim.[8]

### b. *Trial Court's Procedural Error in Granting Summary Adjudication on the Tameny Claim Was Harmless.*

With respect to the *Tameny* claim, Motevalli also contends the trial court committed procedural error (1) in granting summary adjudication on that claim even though the District moved solely for summary judgment and did not seek, in the alternative, summary adjudication of issues; and (2) in granting summary adjudication pursuant to *Daly,* on the ground there was a

---

[8] Because Motevalli cannot state a cause of action against the District for wrongful nonrenewal of the employment contract in violation of public policy, it is unnecessary to address whether such a claim is barred by governmental immunity.

nonrenewal of the contract, rather than a termination, which ground was not briefed or addressed by the parties. Under the circumstances of this case, both these procedural flaws are harmless.

■ We are mindful that a motion for summary adjudication cannot be considered by the court unless the party bringing the motion for summary judgment duly gives notice that summary adjudication is being sought as an alternative to summary judgment, in the event summary judgment is denied. (*Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542, 1545–1546 [235 Cal.Rptr. 106].) Here, the District solely moved for summary judgment. The trial court denied summary judgment but granted summary adjudication on the *Tameny* claim. Given the procedural posture of the matter, the partial grant of summary adjudication was improper.

■ Nonetheless, the error was harmless because the trial court's decision, which disposed of Motevalli's *Tameny* claim, was correct in result. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) Motevalli pled in her complaint that on June 8, 2001, she was notified "her contract would not be renewed." As the parties acknowledge in their appellate briefs, the grant of summary adjudication on the *Tameny* claim was in effect a grant of a motion for judgment on the pleadings on that cause of action—the trial court ruled that pursuant to *Daly*, no cause of action exists for tortious *nonrenewal* of an employment contract in violation of public policy.

■ The sufficiency of the pleadings is a question of law (*Buford v. State of California* (1980) 104 Cal.App.3d 811, 818 [164 Cal.Rptr. 264]) and on such questions, we are required to make an independent determination. (*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529 [260 Cal.Rptr. 713].) We have made our own determination herein. As explained in the preceding section, absent a *termination*, there is no cause of action for wrongful termination in violation of public policy. Further, Motevalli cannot amend her complaint to allege a cause of action for tortious *nonrenewal* of her employment contract in violation of public policy because no such cause of action is recognized. (*Daly, supra,* 55 Cal.App.4th at pp. 45–46.) Therefore, the trial court's dismissal of Motevalli's *Tameny* claim was correct in result and must be upheld.

Finally, leaving aside whether Motevalli had sufficient opportunity below to address the impact of *Daly* on the viability of her *Tameny* claim, that legal issue has been exhaustively briefed at the appellate level. Therefore, Motevalli has no cause to complain that the applicability of *Daly* was not addressed or briefed by the parties at the lower court level.

For these reasons, there was no prejudicial procedural error in the grant of summary adjudication on the *Tameny* claim.

### 3. *Pursuant to Degrassi, the Trial Court Properly Granted JNOV on Motevalli's Cause of Action for Damages for Deprivation of Her Right to Free Speech Under the California Constitution.*

#### a. *The Degrassi Decision.*

In *Degrassi,* the Supreme Court considered whether an individual may bring an action for money damages on the basis of an alleged violation of a provision of the California Constitution, in the absence of a statutory provision or an established common law tort authorizing such a damage remedy for the constitutional violation. (*Degrassi, supra,* 29 Cal.4th at p. 335.)

The plaintiff therein was a former city council member who sought damages to remedy an alleged violation of the free speech clause of the California Constitution, article I, section 2(a), based upon the conduct of various city officials and other individuals that assertedly interfered with plaintiff's performance of her duties. (*Degrassi, supra,* 29 Cal.4th at p. 335 [127 Cal.Rptr.2d 508, 58 P.3d 360].)[9] *Degrassi* concluded that under the circumstances presented, an action for damages did not lie. (*Degrassi,* at pp. 335, 344.)[10]

Initially, *Degrassi* observed there was "no indication in the language of article I, section 2(a), nor any evidence in the history of that provision, from which we may find, within that provision, an implied right to seek damages for a violation of the free speech right set out therein." (*Degrassi, supra,* 29 Cal.4th at p. 342.) However, "the determination that article I, section 2(a), in itself, does not afford a right to seek damages for a violation of that provision does not end our inquiry. 'Just as we have not discovered any basis for concluding that a damages remedy was contemplated or reasonably might be inferred within [article I, section 2(a)] for violation of that provision, we also

---

[9] The free speech clause of article I, section 2(a) states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

[10] At the time this matter was tried to the jury, *Laguna, supra,* 131 Cal.App.3d 816, allowed an action for damages to remedy an asserted free speech and free press rights violation. *Degrassi* noted the *Laguna* court did not consider whether the constitutional provision was intended to include such a remedy, and instead "appears to have recognized a constitutional tort action for such damages." (*Degrassi, supra,* 29 Cal.4th at p. 341.) The Supreme Court has disapproved the "methodology" employed by the majority in *Laguna,* without expressing any view on the correctness of the result reached therein. (*Degrassi, supra,* 29 Cal.4th at p. 342, fn. 7; *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 328, fn. 30 [127 Cal.Rptr.2d 482, 58 P.3d 339] (*Katzberg*).)

have not discovered any basis for concluding that a damages remedy was intended to be foreclosed. In such circumstances, we . . . proceed to consider whether a constitutional tort action for damages to remedy the asserted constitutional violation should be recognized.' [Citation.]" (*Id.*, at p. 342.) *Degrassi* then applied the factors set forth in *Katzberg, supra*, 29 Cal.4th at pages 324–329, to "decline to recognize a constitutional tort action for damages to remedy the asserted violation of article I, section 2(a), alleged in the case before us." (*Degrassi, supra*, 29 Cal.4th at p. 342.)[11]

*Degrassi* ruled "[t]he first two factors set out in *Katzberg* militate against recognition of a constitutional tort action. First, plaintiff had meaningful alternative remedies. She could have sought mandate or an injunction against the challenged conduct under either Code of Civil Procedure section 1085, or under the Ralph M. Brown Act (Brown Act; Gov. Code, § 54950 et seq.). [Fn. omitted.] . . . Second, contrary to plaintiff's assertion that a damages action to remedy an asserted violation of her free speech rights is contemplated by tort law as codified in Civil Code sections 1708 and 3333, . . . as a general matter these provisions do not support recognition of a constitutional tort action for damages." (*Degrassi, supra*, 29 Cal.4th at pp. 342–343.)

*Degrassi* continued, "[b]ut even if we were, at this point in our analysis, inclined toward recognizing a constitutional tort action for damages in the case before us, a final factor would counsel strongly against—and on the facts alleged, preclude—recognition of such an action. [¶] As observed in *Katzberg, courts have expressed reluctance to create a damages action when doing so might, among other things, produce adverse policy consequences* or practical problems of proof, or when there is reason to question the competence of courts to assess particular types of damages. (*Katzberg, supra*, 29 Cal.4th at p. 329.)" (*Degrassi, supra*, 29 Cal.4th at p. 343.)

Applying this third *Katzberg* factor, *Degrassi* explained: "[P]laintiff bases her free speech claim essentially on allegations that defendants improperly frustrated her ability to exercise the duties of a local legislator, because defendants disagreed with her approach and with her views. But legislators who are placed in such a position may be expected either to report suspected wrongdoing to prosecuting authorities, or, more commonly, to employ their political position to publicize the asserted transgressions of other council members. [¶] In circumstances such as these, there is reason for concern that a *damages* action might 'impose too heavy, or too erratic, a penalty' [citation]

[11] The issue in *Katzberg*, which was issued on the same day as *Degrassi, supra*, 29 Cal.4th 333, was whether a plaintiff may bring an action for money damages based upon defendant's alleged violation of his due process "liberty interest" under article I, section 7, subdivision (a), of the California Constitution. (*Katzberg, supra*, 29 Cal.4th at p. 303.) *Katzberg* concluded an action for damages was not available. (*Ibid.*)

and that the threat of such damages improperly might chill the political process. These risks are increased in the absence of an objectively ascertainable measure of damages, and this also is so when 'the amount awarded depends upon the measure of the damage suffered by the particular plaintiff rather than the measure of fault on the part of the defendant.' [Citation.] Accordingly, we are extremely reluctant to endorse a cause of action that would subject to post hoc judicial scrutiny and assessment of damages the kind of political differences, squabbles, and perceived slights that are inherent in a representative government body such as a city council. [Citation.] Even assuming that the type of conduct alleged in the complaint constitutes a violation of the free speech clause by defendants, we conclude that money damages simply are not an appropriate remedy." (*Degrassi, supra,* 29 Cal.4th at pp. 343–344.)

Although *Degrassi* declined to recognize a constitutional tort action for damages to remedy the asserted violation of article I, section 2(a), alleged therein, it also emphasized the limited nature of its holding, stating: "This does not mean that the free speech clause, in general, never will support an action for money damages. Moreover, we do not consider in this case whether any other state constitutional provision may support a constitutional tort action for such damages. Rather, we conclude that the loss or damage of which plaintiff here complains—interference with her functioning and effectiveness as a legislator—does not support recognition of a constitutional tort for damages, even assuming that such interference may result from a violation of the free speech clause." (*Degrassi, supra,* 29 Cal.4th at p. 344.)

> b. *Trial Court Properly Concluded Degrassi Applies Retroactively to This Case.*

As indicated, the Supreme Court issued its decision in *Degrassi, supra*, 29 Cal.4th 333 after the jury rendered its verdict herein. Therefore, as a threshold matter, we address whether the District could avail itself of the *Degrassi* decision in moving for JNOV.

As a general rule, judicial decisions are given retroactive effect, even if they represent a clear change in the law. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978–979 [258 Cal.Rptr. 592, 772 P.2d 1059].) The exception is when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule. (*Id.* at p. 983.) This exception applies in particular when a party has justifiably relied on the former rule. (*Ibid.*; *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 351 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

In an effort to avoid a retroactive application of *Degrassi, supra,* 29 Cal.4th 333, Motevalli contends she duly relied upon *Laguna,* which authorized a claim for damages for a violation of the free speech clause. (*Laguna, supra,* 131 Cal.App.3d 816.) As the trial court found, this contention does not withstand scrutiny. While it is true Motevalli invoked *Laguna* to the extent she pled a claim because of its existence, she did not exclusively rely on that case to the exclusion of others. Her complaint alleged various causes of action and theories of recovery in addition to the claim for damages for violation of the free speech clause.

Moreover, when Motevalli filed this action in July 2001, the Court of Appeal decision in *Degrassi,* contrary to *Laguna,* already had been issued (November 2000) and the Supreme Court granted review in *Degrassi* in February 2001. Thus, at the time Motevalli filed suit, there was a question as to the viability of a free speech damages claim and the issue was pending before the Supreme Court. Under these circumstances, Motevalli reasonably could not have relied on the *Laguna* decision to her detriment.

We conclude there is no basis to deviate from the general rule that judicial decisions are given retroactive effect. Accordingly, the trial court properly found *Degrassi* applies retroactively to guide this case.

### c. *In Light of Degrassi, Motevalli Cannot Maintain a Cause of Action for Damages for Deprivation of Her Free Speech Rights Under the California Constitution.*

Having concluded *Degrassi, supra,* 29 Cal.4th 333 applies retroactively, we examine whether the trial court properly determined the *Degrassi* factors preclude Motevalli's cause of action for damages for alleged violation of her free speech rights under the California Constitution.

### (1) *Meaningful Alternative Remedies.*

The initial factor set forth in *Degrassi* is whether a plaintiff has meaningful alternative remedies. (*Degrassi, supra,* 29 Cal.4th at p. 342.) The District contends Motevalli had ample alternative remedies, specifically, an action for a writ of mandate to compel reinstatement to her position (Code Civ. Proc., § 1085), a suit for injunctive relief to enjoin the violation of her free speech rights (Code Civ. Proc., § 526), as well as workers' compensation for her alleged emotional injury. However, given Motevalli's status as a probationary/provisional teacher, it is questionable whether she could have obtained a writ of mandate to compel the renewal of her contract, let alone back pay or other damages.

### (2) *Ascertainability of Damages.*

Another pertinent factor is the ascertainability of Motevalli's damages. The *Degrassi* court was troubled by the absence of an objectively ascertainable measure of damages in that case, which was based on allegations that defendants improperly frustrated a city council member's ability to perform her duties. (*Degrassi, supra,* 29 Cal.4th at p. 343 [127 Cal.Rptr.2d 508, 58 P.3d 360].) Here, in contrast, to the extent Motevalli can establish economic damages based on the nonrenewal of her teaching position, damages would be readily ascertainable.

### (3) *"Adverse Policy Consequences."*

However, the critical factor in this fact situation is whether recognition of a damages action would produce "adverse policy consequences." (*Degrassi, supra,* 29 Cal.4th at p. 343.) Here, plainly it would.

██ Untenured teachers have fewer rights than permanent teachers. This difference is the product of an explicit legislative scheme. (See, e.g., §§ 44911, 44915, 44929.21, 44932, 44948, 44953, 44954.) Recognition of a constitutional damages action here would result in the anomaly of untenured teachers denied rehiring having *greater* rights than tenured teachers who have been discharged. A tenured teacher is required to exhaust his or her internal administrative remedies before going to court (see *Palmer v. Regents of University of California* (2003) 107 Cal.App.4th 899, 903–906 [132 Cal.Rptr.2d 567]), which decision then would be reviewed on administrative mandamus (Code Civ. Proc., § 1094.5), wherein the employer's liability would be determined by a court before the employee could bring an action for damages. (See *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 482–483 [131 Cal.Rptr. 90, 551 P.2d 410] [plaintiff's tort action for damages was barred until plaintiff sought and obtained mandamus relief setting aside adverse disciplinary action].)

██ However, if a probationary/provisional teacher who is not rehired were allowed to proceed directly to court in a damages action in which liability would be decided by a jury, that teacher would be in a position superior to his or her tenured counterparts. To allow a probationary/provisional teacher, such as Motevalli, to bring an action for damages in this context would be to provide protection the Legislature chose to withhold.

Because it would be utterly anomalous to give an employee such as Motevalli a constitutional tort remedy which would be superior to the remedies available to a permanent teacher, the trial court properly granted JNOV under *Degrassi* in favor of the District on Motevalli's cause of action for damages under the California Constitution.[12]

## DISPOSITION

The judgment is affirmed. The parties shall bear their respective costs on appeal.

Croskey, J., and Aldrich, J., concurred.

The petition of appellant Amitis Motevalli for review by the Supreme Court was denied December 15, 2004.

---

[12] Because we uphold the judgment entered pursuant to the grant of the District's motion for JNOV, it is unnecessary to reach the District's cross-appeal.