[No. D046833. Fourth Dist., Div. One. Mar. 21, 2007.]

JAMES T. CARTER, Plaintiff and Respondent, v.
ESCONDIDO UNION HIGH SCHOOL DISTRICT, Defendant and
Appellant.

[No. D047649. Fourth Dist., Div. One. Mar. 21, 2007.]

JAMES T. CARTER, Plaintiff and Appellant, v.
ESCONDIDO UNION HIGH SCHOOL DISTRICT, Defendant and
Respondent.

924

## COUNSEL

Stutz Artiano Shinoff & Holtz, Daniel R. Shinoff, Jeffery A. Morris and Paul V. Carelli IV for Defendant and Appellant and for Defendant and Respondent.

Ross, Dixon & Bell and Jon R. Williams for Plaintiff and Respondent and for Plaintiff and Appellant.

## OPINION

**IRION, J.**—James T. Carter sued his employer, the Escondido Union High School District (EUHSD), claiming that EUHSD wrongfully terminated his employment in violation of public policy. At trial, Carter supported his allegations by presenting evidence that EUHSD declined to "reelect" him to his probationary teaching position because, while employed as a teacher at another school district, Carter informed the athletic director there that the football coach had recommended a nutritional supplement to a student.

After the jury found that Carter's report to the athletic director had been "a motivating reason" for EUHSD's adverse job action and that Carter was entitled to damages of over $1 million, the trial court entered judgment against EUHSD.

As discussed in more detail below, we are required by controlling precedent to reverse. For an employer to be liable for the tort of wrongful termination in violation of public policy, the employer's conduct must violate a public policy that is " 'fundamental,' " " 'well established' " and "carefully tethered" to a constitutional or statutory provision. (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*).) The public policy upon which EUHSD's liability was based in the instant case—characterized by Carter on appeal as "the policy against

teachers recommending weight-gaining substances to students"—fails to satisfy these requirements. There may indeed be sound policy reasons to bar football coaches from recommending weight-gaining substances to high school students, but as there is currently no law that does so, any such prohibition must be enacted explicitly by the Legislature, not implicitly by the courts. Thus, while EUHSD's decision to terminate Carter may have been arbitrary, misguided and petty, it was not prohibited by law or in contravention of well-established public policy, and thus provides no basis for liability under California law.

## I

## FACTS[1]

During the 1999–2000 school year, Harlan Edison was a senior at Monte Vista High School in the Grossmont Union High School District and a member of the school's football and basketball teams. Edison hoped to play college football after graduation. In the spring semester, Edison took three weight-training classes with football coach Ed Carberry. During that time, Coach Carberry told Edison he was not big enough to play division I college football, and suggested that Edison consume protein drinks containing creatine to gain weight. Edison subsequently bought a "protein shake" containing creatine from a local GNC store and drank the shake while lifting weights at a friend's house.[2]

During that same year, Carter was a teacher and basketball coach at Monte Vista High School. Carter, who knew Edison from the basketball team, noticed during the spring semester that Edison was gaining weight. Edison told Carter he had taken "weight gainer" at the recommendation of Coach Carberry.

About a week after drinking the protein shake, Edison began having problems with his kidneys and required temporary hospitalization. When Carter heard about the hospitalization, he went to see Phil Poist, the school's

---

[1] Certain of the facts recited herein were vigorously disputed by the parties at trial; nevertheless, as is customary, we recite the facts in the light most favorable to the jury's findings.

[2] The parties did not introduce any evidence regarding creatine at the trial. There is no dispute, however, that creatine is a lawful dietary supplement that can be purchased over the counter at retail stores such as GNC.

athletic director. Carter testified he did so "because I knew that Harlan had been injured and I wanted to bring it to [Poist's] attention." Carter told Poist that he had "learned Harlan Edison was taking a weight gainer at the suggestion of Ed Carberry." Poist told Carter that he was not going to take any action "unless the parents g[o]t involved"; Carter responded that if no action was taken, he would "be leaving Monte Vista if [he] could find a job someplace" else.

Carter then applied to teach at Orange Glen High School in the Escondido Union High School District and received a probationary appointment as a teacher. After accepting the position, Carter learned that Diana Carberry, Coach Carberry's wife, would be the interim principal at Orange Glen.

Carter taught at Orange Glen for the 2000–2001 school year, and again for the 2001–2002 school year after his probationary teaching status was renewed for a second year. On or about March 13, 2002, Carter received a letter from EUHSD informing him that his employment at Orange Glen would terminate at the end of the second probationary year.

Carter subsequently filed suit against EUHSD, alleging that he was unlawfully terminated in violation of public policy.[3] A jury trial was held and, at its conclusion, the jury returned a special verdict, answering "Yes" to the following questions:

"Question No. 1: Do you find that Plaintiff reported that he believed Coach Ed Carberry encouraged a student athlete to use a weight-gaining substance?"

"Question No. 2: Was the Plaintiff's reporting that he believed Coach Ed Carberry encouraged a student athlete to use a weight-gaining substance a motivating reason for the determination to not reelect the plaintiff?"

"Question No. 3: Did the determination to not reelect the Plaintiff cause the Plaintiff harm?"

Having answered these three questions in the affirmative, the jury calculated Carter's damages to be $1,185,258. The trial court then entered

---

[3] Initially, Carter also alleged a claim for wrongful termination against Diana Carberry and a claim for intentional infliction of emotional distress against Diana Carberry and Ed Carberry. The trial court ruled on summary judgment that Carter had not adequately supported his claim for intentional infliction of emotional distress, and that his wrongful termination claim could go forward only against his employer, EUHSD. These rulings are not at issue in the instant appeal.

judgment against EUHSD for wrongfully terminating Carter in violation of public policy.[4] EUHSD appeals.

In this consolidated action, Carter also appeals; his sole request is for a reversal of the trial court's denial of his motion for attorney fees, pursuant to Code of Civil Procedure section 1021.5, as the "successful party" in the lawsuit.[5]

II

DISCUSSION

EUHSD makes a number of challenges to the judgment on appeal. As we agree with EUHSD that the judgment must be reversed because the school district's liability was not grounded, as required by our Supreme Court, on a well-established, fundamental public policy derived from a constitutional or statutory provision, we reverse without reaching the alternative grounds for reversal raised by EUHSD.[6]

---

[4] The court also denied EUHSD's motions for a new trial and judgment notwithstanding the verdict, as it had EUHSD's earlier motion for directed verdict. In those motions EUHSD asserted the same grounds it now asserts on appeal.

[5] Code of Civil Procedure section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons . . . ."

[6] In addition to the challenge identified above, EUHSD contends that: (i) there was no substantial evidence to support a finding that Carter's report of Carberry's conduct led to his termination; (ii) there was no substantial evidence to support the jury's damages calculation; and (iii) in any event, the tort of wrongful termination does not apply to the non-reelection of a probationary employee such as Carter. For this last point, EUHSD relies on *Motevalli v. Los Angeles Unified School Dist.* (2004) 122 Cal.App.4th 97, 111 [18 Cal.Rptr.3d 562] (holding that teacher who was "employed under an *emergency credential*" and could not "ascend to permanent status merely through the passage of time" could not sue for wrongful termination). The California Teachers Association filed an application to appear as amicus curiae on Carter's behalf on this point, contending that *Motevalli* "was wrongly decided" and "should not be followed." As we note above, we need not, and do not, reach the question, because even if we agreed that *Motevalli* was wrongly decided (or that its reasoning does not apply), we would still be compelled to reverse the judgment because liability in the instant case is not based on a violation of a constitutional or statutory-based public policy. Consequently, we deny the application.

As a consequence of our reversal of the judgment, we necessarily reject Carter's contention in his cross-appeal that the trial court erred in denying his request for attorney fees under Code of Civil Procedure section 1021.5.

## A. *Applicable Legal Principles*

An employer may discharge an at-will employee "for no reason, or for an arbitrary or irrational reason," but is precluded from doing so "for an unlawful reason or a purpose that contravenes fundamental public policy."[7] (*Gantt, supra,* 1 Cal.4th at p. 1094.) A discharge is actionable as against public policy only if it violates a policy that is: "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) 'substantial' and 'fundamental.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 901–902 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (*Stevenson*).)

The requirement that the policy underlying employer liability be "tether[ed]" to "specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge." (*Stevenson, supra,* 16 Cal.4th at p. 889.) "This limitation recognizes an employer's general discretion to discharge an at-will employee without cause . . . , and best serves the Legislature's goal to give law-abiding employers broad discretion in making managerial decisions." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 79–80, 82 [78 Cal.Rptr.2d 16, 960 P.2d 1046].)

Whether the policy upon which a wrongful termination claim is based is sufficiently fundamental, well-established and tethered to a statutory or constitutional provision to support liability is a legal question that we review de novo.[8] (*Ghirardo, supra,* 8 Cal.4th at p. 799.)

---

[7] As noted in footnote 6, *ante,* EUHSD contends that Carter has fewer rights than an at-will employee. We assume for purposes of this appeal, however, that, as Carter contends, his rights as a probationary employee are essentially "identical to th[ose] of an at-will employee."

[8] The trial court ruled, with the agreement of the parties, that the decision as to whether the jury's findings established a violation of public policy was a legal question for the court to decide. Our review of this legal question, which does not depend on resolution of any disputed facts, is de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960] (*Ghirardo*).)

### B. *EUHSD's Liability Is Not Carefully Tethered to Education Code Section 49423*

Carter argues that the pertinent public policy upon which EUHSD's liability was based is found in "Education Code section 49423 [restricting school employees from assisting in the taking of most medications under most circumstances], plus California Code of Regulations, sections 601 and 604" which, he argues, establish "the policy against teachers recommending weight-gaining substances to students." (Brackets in original.) Carter adds, without elaboration or citation to authority, that this "policy is, most definitely, substantial and well-defined."

■ Education Code section 49423 (section 49423) states that "any pupil who is required to take, during the regular schoolday, medication prescribed for him or her by a physician or surgeon, may be assisted by the school nurse or other designated school personnel . . . if the school district receives" a "written statement from the physician detailing the name of the medication, method, amount, and time schedules by which the medication is to be taken and a written statement from the parent . . . indicating the desire that the school district assist the pupil in the matters set forth in the statement of the physician." (*Id.*, subds. (a), (b).)

Section 49423 does not support EUHSD's liability in the instant case because the public policy it establishes was not violated by Carter's termination.

■ Section 49423 by its terms does not prohibit *any* conduct. Instead it is expressly permissive, delineating a circumstance under which the school nurse "may" assist in the administration of medication to a student during the schoolday. An accompanying Education Code section emphasizes that it is "the intent of the Legislature to provide *positively* for the health services, many of which may be performed in the public schools only by physicians and school nurses." (Ed. Code, § 49426, italics added.) As the statute is explicitly permissive, there is, of course, no delineation of any sanctions (criminal or otherwise) that would apply to a failure to abide by its terms. This absence of any explicit prohibition of any conduct and the omission of any sanctions for noncompliance strongly suggest that section 49423 does not establish a fundamental public policy that could support a wrongful termination claim. (*Sullivan v. Delta Air Lines, Inc.* (1997) 58 Cal.App.4th 938, 945 & fn. 6 [68 Cal.Rptr.2d 584] ["the prospect of criminal sanctions to punish the violation of a policy has been a significant factor in the determination that a

policy is substantial and fundamental"].) Instead, as "it is difficult to determine precisely what employer conduct [section 49423] prohibits" (*Sullivan*, at p. 945), the statute does not "sufficiently describe [any] prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law" as is required for wrongful termination liability. (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480 [16 Cal.Rptr.2d 888].)[9]

Even if we were to assume, as the trial court did, that what the Legislature *really meant* in enacting section 49423 was that "assistance" as described in the statute is not discretionary with parental permission, but in fact *prohibited* without it, the action allegedly taken here by Coach Carberry would still not fall within its scope. In fact, virtually every portion of the statute is inapplicable. The protein shake was not "medication" "prescribed for [Edison] by a physician or surgeon"; Edison was not "required to take [the shake], during the regular schoolday"; and Edison was not "assisted" in taking it "by the school nurse or other designated school personnel." (§ 49423, subd. (a).) Thus, even if the statute is intended to implicitly prohibit the actions it describes absent written parental authorization, those actions would not include Coach Carberry's suggestion that a student could improve his college football recruitment prospects if he consumed a protein drink at some unspecified time in the future.

■ The implementing regulations of the Department of Education do not alter this analysis. The only portion of the regulations that strengthen Carter's contention is found in California Code of Regulations, title 5, section 601, subdivision (b) which states, in pertinent part, that the definition of "medication" includes "over-the-counter remedies, nutritional supplements, and herbal remedies."[10] While the broadening of the definition of "medication" to

---

[9] Despite the fact that the statute does not explicitly prohibit any conduct, the trial court read an implied prohibition into the statute, ruling: "Stated another way," the statute means that "school personnel are prohibited from *assisting* a student in the taking of medication without a doctor's note and a parent's note." By stating the statutory text "another way," we believe the trial court failed to heed our Supreme Court's direction that "courts should venture into th[e] area [of declaring public policy], if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.' " (*Gantt, supra*, 1 Cal.4th at p. 1095.) In keeping with our Supreme Court's guidance, courts assessing liability in wrongful termination actions should not restate unambiguous statutory language "another way," and then assess liability based on a violation of the *restated* statutory text. (See *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196] ["If there is no ambiguity [in a statute], then we presume the lawmakers meant what they said, and the plain meaning of the language governs"].)

[10] Carter also references California Code of Regulations, title 5, section 604, subdivision (a), but that regulation, which states "[a] school nurse may administer medication to a pupil or otherwise assist a pupil in the administration of medication as allowed by law and in keeping with applicable standards of professional practice," adds nothing to his contention.

include "nutritional supplements" helps Carter's claim to overcome one hurdle (placing protein shakes more comfortably within the term "medication"), the regulatory framework as a whole further demonstrates the inapplicability of the underlying statute to this case.

■ Section 49423's implementing regulations are expressly "limited to addressing a situation where a pupil's parent or legal guardian has initiated a request to have a local educational agency dispense medicine to a pupil, . . . as prescribed by a physician or other authorized medical personnel." (§ 49423.6, subd. (b).) Consequently, like the statute itself, the regulation speaks solely to the administration by school medical personnel of required medical care, and as pertinent here clarifies that if a student were instructed by a physician to take a "nutritional supplement" during the schoolday, the school nurse "may" assist in administering the supplement if the student submits appropriate written authorization. As explained above, this pronouncement of covered conduct is not sufficiently similar to the actions taken by Coach Carberry to support EUHSD's wrongful discharge liability. (See, e.g., *Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1110 [119 Cal.Rptr.2d 698, 45 P.3d 1162] ["an employer cannot be held liable for violating a public policy that was not manifest at the time it committed the alleged tortious action"]; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 668 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*) [the public policy supporting a wrongful termination claim should be "one about which reasonable persons can have little disagreement, and which was 'firmly established' at the time of discharge"].)[11]

■ In sum, we are unable to discern from section 49423 and its implementing regulations any fundamental and well-established public "policy against teachers recommending weight-gaining substances to students"; consequently, the statute cannot form the basis for Carter's wrongful termination action.[12]

---

[11] Were we to affirm the judgment under Carter's theory that section 49423 prohibits school personnel from *suggesting* any "medication," including, as defined in California Code of Regulations, title 5, section 601, subdivision (b) "over-the-counter remedies, nutritional supplements, and herbal remedies," there is no principled way to limit this prohibition to the legal creatine supplement at issue in this case. We would consequently be announcing a new and far-reaching prohibition that would include suggesting that a student take her vitamins, use Pepto-Bismol for gastrointestinal distress, calamine lotion on a rash, or hand lotion on dry skin. There may be sound public policy reasons for such a law, but it is the Legislature, not the courts, that must decide that question. Were we to do so, our ruling would constitute exactly the kind of "judicial policymaking" that is forbidden under *Gantt*. (*Gantt, supra*, 1 Cal.4th at p. 1095.)

[12] Carter's efforts to divine a public policy against teacher's recommending protein drinks from the trial testimony are equally unavailing. Carter cites the testimony of the commissioner at the California Interscholastic Federation, a nonprofit organization, who stated he would not

## C. EUHSD's Liability Is Not Carefully Tethered to California's Whistleblower Statute

We also reject Carter's implicit argument that the judgment against EUHSD is supported by California's general whistleblower statute, Labor Code section 1102.5 (section 1102.5).[13] Section 1102.5 prohibits termination of an employee "for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (§ 1102.5, subd. (b); see also *id.*, subds. (d), (e).)

Carter's conduct in disclosing to the athletic director that Coach Carberry had recommended a protein shake to a student is not protected by section 1102.5. First, as explained above, the information disclosed by Carter did not "disclose[] a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (§ 1102.5, subd. (b); see *Love v. Motion Industries, Inc.* (N.D.Cal. 2004) 309 F.Supp.2d 1128, 1134 ["Plaintiff's disclosure does not meet the standard for protected activity under Section 1102.5(b), because the disclosed activity does not violate any federal or state statute, rule, or regulation"].) Second, Carter's conversation with Poist was not motivated by his belief that a law had been broken. In fact, Carter took no action upon learning that Carberry had recommended the shakes; rather, Carter testified he went to see Poist *after Edison was hospitalized* "because [he] knew that Harlan had been injured and [he] wanted to bring it to [Poist's] attention." Then, when Poist stated that no action would be taken against Carberry, Carter made no further report. Third, even if Carter subjectively believed that Carberry had violated a statute or regulation and approached Poist for that reason, the record is devoid of anything that would support a conclusion that his belief was "reasonable." Protein shakes containing creatine are not unlawful under either state or federal law. Consequently,

---

personally "condone" recommending a dietary supplement to a student; and the testimony of the superintendent of EUHSD, who testified he would not want his teachers to *"provide weight-gaining supplements to students."* (Italics added.) This testimony cannot support a conclusion that there was a well-established, fundamental public policy *delineated in a statutory or constitutional provision* prohibiting Coach Carberry's conduct. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1257 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*) ["The tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others"].)

[13] While Carter does not specifically identify the whistleblower statute as support for the judgment, he references whistleblowing, arguing, for example, that "the activity that Carter engaged in—essentially 'blowing the whistle' on Coach Carberry"—is "a matter of fundamental public policy." Despite Carter's failure to make this contention explicit, we see no unfairness in evaluating this argument with respect to EUHSD, as both EUHSD on appeal and the trial court below recognized the whistleblower statute as a potential basis for liability.

there is no reason to believe that merely suggesting that a high school senior drink one at some unspecified time in the future is *illegal.*

As Carter's disclosure was not protected by California's whistleblower statute, EUHSD was not prohibited from discharging him based on that disclosure. (*Foley, supra,* 47 Cal.3d at p. 670 ["No enactment expressly requires an employee to report relevant information concerning other employees to his employer, and none prohibits discharge of the employee for so doing"].)

The situation in the instant case is analogous to that in *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378 [37 Cal.Rptr.3d 113] (*Patten*), where our colleagues in the Third District rejected a teacher's lawsuit alleging retaliatory firing under section 1102.5.

In *Patten, supra,* 134 Cal.App.4th 1378, 1382, the plaintiff/teacher claimed he was fired because he brought to the attention of his supervisor: (1) "that a male physical education . . . teacher . . . was peering into the girl's locker room"; (2) "an off-color remark that a male science teacher . . . had made to a female student"; and (3) requested that additional security staff be added after a student was assaulted. The *Patten* court ruled that these disclosures "do not rise to the level of blowing a whistle," but were made in "the context of an internal personnel matter based on a student complaint, rather than in the context of a legal violation." (*Id.* at p. 1385.) The court reasoned: "To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." (*Ibid.*)

As in *Patten, supra,* 134 Cal.App.4th 1378, 1385, Carter's disclosure here was not whistleblowing under section 1102.5, but rather a routine "internal personnel disclosure" that was, at its core, a disagreement between the football and basketball coaches about the proper advice to give to student athletes. This type of disclosure is not encompassed by section 1102.5, and consequently cannot support a wrongful termination action. (See *Patten, supra,* 134 Cal.App.4th at p. 1385; *Foley, supra,* 47 Cal.3d at p. 670 [employer's firing of employee for reporting that another employee was under

investigation by the FBI did not support claim of wrongful termination because firing did not implicate a "substantial public policy"]; *Read v. City of Lynwood* (1985) 173 Cal.App.3d 437, 444 [219 Cal.Rptr. 26] ["Appellant had every right to oppose the appointment of this developer and to make her opposition known. However, appellant forgets that as a probationary employee she can be fired for any reason and fails to identify a public policy supported by statute which prevents the termination of a probationary employee for opposing a decision made by her bosses"]; *American Computer Corp. v. Superior Court* (1989) 213 Cal.App.3d 664, 668 [261 Cal.Rptr. 796] [reporting to supervisors of suspected embezzlement within company could not support claim for termination in violation of public policy]; *Rivera v. National R.R. Passenger Corp.* (9th Cir. 2003) 331 F.3d 1074, 1080 [rejecting claim where plaintiff's "situation is similar to that of the employee in *American Computer.* If [plaintiff] had reported the illegal activities of his co-workers, [he] may have achieved the 'laudable goal' of preventing crime, but this is not enough to fit within the narrow confines of wrongful termination in violation of public policy"].)[14]

In sum, Carter's "failure to identify a statutory or constitutional policy that would be thwarted by his . . . discharge dooms his cause of action." (*Turner, supra,* 7 Cal.4th at p. 1257.) "Even if [EUHSD's] decision was misguided or based on an erroneous factual premise, that would not eliminate the need for a clear expression of legislative policy disfavoring a discharge for this reason to support a wrongful discharge claim." (*Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 825 [118 Cal.Rptr.2d 807].)

---

[14] Without specifically arguing that his conduct was protected by the mandated reporter obligations of the Penal Code, Carter makes a conclusory assertion that "he did nothing more than fulfill his mandatory reporting obligation to his immediate supervisor." Carter is mistaken. Carter, as a teacher, was a "mandated reporter" under Penal Code section 11165.7, and consequently was required by law to report to police or the county child welfare agency any "child abuse and neglect" he became aware of during the course of his employment. It is undisputed, however, that Carter did not make any such report, and, in fact, Carter testified he did not believe Carberry's conduct constituted "child abuse." (See Pen. Code, §§ 11165.9, 11166, subd. (a), 11165.7 [if a mandated reporter during the course of employment obtains "knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect," the teacher is mandated to report that abuse or neglect "to any police department or sheriff's department, not including a school district police or security department . . . , or the county welfare department"].) Instead, Carter reported Carberry's actions to his supervisor Poist, a course of action the Legislature has specifically stated *does not* constitute compliance with the mandated reporter statute. (Pen. Code, § 11166, subd. (i)(3) ["Reporting the information regarding a case of possible child abuse or neglect to an employer, supervisor, school principal, school counselor, coworker, or other person shall not be a substitute for making a mandated report"].) Consequently, Carter's conversation with Poist is not protected by the mandated reporter statute. (Pen. Code, § 11166, subd. (c) [failure to make required report is a misdemeanor].)

## DISPOSITION

The judgment is reversed. Escondido Union High School District to recover costs on appeal.

McConnell, P. J., and Benke, J., concurred.

The petition of respondent James T. Carter for review by the Supreme Court was denied June 20, 2007, S152257.