Filed 11/10/21  Carranza v. City of L.A. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LILLIAN L. CARRANZA, Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent. | B304756 (Los Angeles County Super. Ct. No. BC690761) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Georgina Torres Rizk, Judge.  Affirmed.

Law Offices of Gregory W. Smith, Gregory W. Smith, Leila K. Al Faiz; Benedon & Serlin, Douglas G. Benedon and Judith E. Posner for Plaintiff and Appellant.

Lozano Smith, Mark W. Waterman, Mark K. Kitabayashi and Lauren L. Lyman for Defendant and Respondent.

————————————

Lillian L. Carranza, a captain in the Los Angeles Police Department (LAPD), sued the City of Los Angeles (the City) for whistleblower retaliation under Labor Code[1] section 1102.5, subdivision (b) after she reported that the LAPD was misclassifying aggravated assaults as simple assaults and was not promoted to commander. The court granted summary judgment in favor of the City on the grounds that the misclassifications were public knowledge after they were reported by the Los Angeles Times. For the reasons stated below, we affirm.

## BACKGROUND

I.      LAPD's classification of crimes

The LAPD participates in the Federal Bureau of Investigation's (FBI) Uniform Crime Reporting Program (UCR), which tracks crimes nationwide based on the seriousness of the crime, frequency of occurrence, pervasiveness, and likelihood of being reported. Before law enforcement agencies report their crime statistics to the FBI, they must classify crimes according to criteria set forth in the UCR's manual. As the UCR is a nationwide program, its classification system does not correlate with California law or the Penal Code. To classify a crime, law enforcement agencies use the crime reports that detail the facts of each incident to analyze those facts according to the UCR's classification system.

The relevant UCR classifications here are aggravated and simple assaults. The UCR defines an aggravated assault as an

---

[1] All undesignated statutory references are to the Labor Code.

unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury and is usually accompanied by use of a weapon or means likely to produce death or great bodily harm. The UCR defines a simple assault as an assault which does not involve the use of a firearm, knife, cutting instrument, or other dangerous weapon and in which the victim did not sustain serious or aggravated injuries. The UCR manual seems to acknowledge that assaults are difficult to classify and provides additional guidance, instructing law enforcement agencies to consider the type of weapon employed or the use of an object as a weapon, the seriousness of the injury, and the intent of the assailant to cause serious injury.

II.    The Los Angeles Times reports that the LAPD is misclassifying crimes.

In August 2014, the Los Angeles Times published an article criticizing the LAPD's crime classification reporting to the FBI. (Poston & Rubin, *LAPD misclassified nearly 1,200 violent crimes as minor offenses*, L.A. Times (Aug. 9, 2014).) The article's analysis was based on summaries of crime reports from October 2012 through September 2013. The investigation concluded that nearly 1,200 violent crimes had been misclassified, of which almost 1,100 were aggravated assaults.

In response to the article, the LAPD instituted reforms to ensure its crime classifications were accurate. It established a unit to serve as a liaison to the FBI to ensure compliance with the UCR and made watch commanders responsible for classifying crimes rather than record clerks. Since instituting the reforms, the number of incidents classified as aggravated assaults has risen consistently.

III.   Carranza reports further crime misclassifications to her superiors.

Carranza is a captain in the LAPD with extensive experience in the classification of crimes. After the publication of the Los Angeles Times article, Carranza was tasked with auditing those crimes identified by the article to determine whether the crimes in question had been misclassified.

In addition, on her own initiative, Carranza audited the crime classifications for her division as well as other area divisions within LAPD's jurisdiction. Carranza's audits revealed that a significant number of aggravated assaults were still being misclassified as simple assaults despite LAPD's reforms. Carranza took this information to her superiors and either received no response or was chastised for auditing the crime statistics of other divisions outside of her command. For example, Carranza reported the misclassifications to Commander Regina Scott and asked to reclassify the subject crimes before the FBI published its 2014 crime statistics. Scott told Carranza, "you're not going to reclassify anything," "you need to stand down," and "this is coming straight from the top." In another instance, Carranza notified Commander Jon Peters about the misclassification of crimes across divisions. Peters said he would look into the misclassifications, but never followed up with Carranza or asked her about her specific findings. Carranza also emailed a copy of the report listing the misclassified assaults to the Director of LAPD's Office of Operations, Assistant Chief Jorge Villegas. Villegas never responded to Carranza's email and told her later, "You know why I never responded to your email . . . ? Because that had nothing to do with you. You need to focus on your command. Stay in your lane."

Carranza emailed a list of misclassified assaults to the commanding officer of LAPD's COMPSTAT[2] division John Neuman and his subordinate assigned as the liaison to the FBI. In this correspondence, Carranza did not state that the misclassifications violated any statute or regulation or that any individual had engaged in illegal conduct. Rather, Carranza focused on the fact that the misclassified crimes and inaccurate statistics were unfairly relied upon to compare her division to other divisions that had reported an overall decrease in violent crime based on the misclassified aggravated assaults. Carranza stated, "My intent is to ensure accurate reporting and that we are all being held to the same standards and expectations" and that "[n]ormally, [she] would not care, but these numbers are being used to compare and rank Van Nuys."

After Carranza did not receive a response from the COMPSTAT division, she emailed Deputy Chief Robert Green. Again, Carranza did not identify any statute or regulation that had been violated, but stated that ignoring the problem would aggravate the issue and would just be "kicking the can down the road." She repeated her desire for divisions to be "held to the same standard" and expressed concern that the misclassifications could lead to "another public embarrassment on the front page of the LA Times."

Eventually, some of those simple assaults that Carranza had identified as misclassified were properly reclassified as aggravated assaults. Nonetheless, Carranza continued to receive

---

[2] COMPSTAT is short for computer statistics. LAPD's COMPSTAT division provides statistical data for the management of police operations.

negative feedback from her superiors, including then Assistant Chief Michel Moore, who told her to "stay in her lane."

IV.     Carranza seeks a promotion to commander.

Around this time, Carranza sought a promotion from captain to commander. However, despite Carranza's rank on the promotional list and receiving the highest score on the commander's examination, the LAPD did not promote Carranza to commander. Deputy Chief John Sherman told Carranza she ran a very good command and that he appreciated the work she had done, but that she would not be promoted because of her deficient executive communication skills. He advised Carranza that, "if you want to promote and become part of the top .005 percent of [the LAPD], you need to stop meddling into other people's business and stop auditing numbers, you need to stay in your lane."

After Carranza was passed over during a second round of promotions, she was transferred to the commercial crimes division where she is currently the commanding officer. No commanding officer from the commercial crimes division has been promoted to commander within the last 11 years whereas 25 out of the last 30 promotions to commander have been from area commanding officer positions like the one previously held by Carranza.

V.      Procedural history

Carranza sued the City for whistleblower retaliation under section 1102.5. Carranza alleged she had engaged in protected activity by complaining about crime misclassification and the systemic underreporting of violent crime, which she believed violated LAPD's legal obligation to maintain records for reporting

accurate crime statistics. Carranza also alleged LAPD had retaliated against her by undermining her chances of succeeding as a captain and failing to promote her to commander.

The City moved for summary judgment, contending Carranza had not engaged in protected activity within the meaning of section 1102.5 and thus could not recover for whistleblower retaliation as a matter of law. In any event, LAPD did not retaliate against Carranza and her failure to become a commander was due to deficiencies in her communication skills, not her reports of crime misclassification.

The trial court granted summary judgment in favor of the City, concluding that LAPD's problem with misclassification of aggravated assaults was well-known, as evidenced by the Los Angeles Times article and therefore Carranza did not reveal a hidden or unknown violation.

Carranza appealed.

## DISCUSSION

### I.   Standard of review

Summary judgment is proper when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) We independently assess the correctness of the trial court's ruling and apply the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the

moving party is entitled to judgment as a matter of law.  (*Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 591.)  "The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Kaneko v. Yager* (2004) 120 Cal.App.4th 970, 977.)

II.    Carranza cannot establish that she engaged in protected activity under section 1102.5.

Carranza has alleged a single cause of action against the City for violation of section 1102.5.  Section 1102.5, subdivision (b) prohibits an employer from retaliating "against an employee for disclosing information . . . to a government or law enforcement agency, [or] to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of [a] state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

To establish a violation of section 1102.5 requires:  " '(1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation.' " (*Ross v. County of Riverside*, *supra*, 36 Cal.App.5th at p. 591.)  To establish a prima facie case of retaliation, "the plaintiff must show (1) the plaintiff engaged in protected activity, (2) the defendant subjected the plaintiff to an adverse employment action, and (3) there is a causal link between the two." (*Id.* at p. 592.)

An employee engages in protected activity under section 1102.5, subdivision (b) when the employee "discloses to a governmental agency ' "reasonably based suspicions" of illegal

8

activity.' " (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138.) "A report made by an employee of a government agency to their employer is a disclosure of information to a government or law enforcement agency." (§ 1102.5, subd. (d).) When an employee discloses his or her reasonably based suspicions of illegal activity to his or her superiors, the employee need not identify a specific violation of law to trigger whistleblower protection. (*Ross v. County of Riverside, supra*, 36 Cal.App.5th at p. 592.) However, an employee's reasonably based suspicion must be grounded in some statute, rule, or regulation which may have been violated by the reported conduct. (*Ibid.*)

Carranza's section 1102.5 cause of action fails as a matter of law because she cannot establish that she engaged in protected activity.[3] Specifically, Carranza cannot show that she reported a violation of a state or federal statute or noncompliance with a local, state or federal rule or regulation. Nor can Carranza establish that she reported her reasonable suspicions of illegal activity when she notified her superiors about the misclassifications.

It is undisputed that Carranza did not identify a specific law that LAPD was violating when she initially reported that aggravated assaults were being routinely misclassified as simple

---

[3] We note that the trial court granted summary judgment on a different ground from the one we find determinative here. We may affirm a summary judgment on any correct legal theory, if the parties had an adequate opportunity to address the theory in the trial court. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.) The parties fully briefed the issue of whether Carranza engaged in protected activity in the lower court and on appeal.

assaults according to the UCR's criteria. Carranza's reports identified the misclassifications as a potential source of public embarrassment and indicated that the LAPD's "numbers should be clean," but characterized the problem as nonurgent and something that could be corrected later. Carranza was concerned that the skewed statistics were being used unfairly to compare the performance of her division to others who were misclassifying assaults.

Carranza's failure to report a specific violation to her superiors notwithstanding, she would still be entitled to whistleblower protection if she established that she was reporting her reasonably based suspicions of illegal activity by pointing to a specific statue, rule, or regulation that may have been violated by the misclassifications. (*Ross v. County of Riverside*, *supra*, 36 Cal.App.5th at p. 592.) Carranza contends that she reasonably believed that the LAPD was violating its duty to maintain correct records under Penal Code section 13020. Penal Code section 13020, subdivision (a) obligates every chief of police to "install and maintain records needed for the correct reporting of statistical data." Carranza asserts that by misclassifying aggravated assaults as simple assaults under the criteria set forth by the UCR, the LAPD was not fulfilling its legal obligation under Penal Code section 13020.

Carranza's reliance on Penal Code section 13020 is unavailing. To the extent Penal Code section 13020 creates a duty for the LAPD to maintain and install correct records for the reporting of statistical data, it does not create an additional duty for the LAPD to correctly classify crimes according to the UCR's criteria without error. Indeed, because classifying crimes is a subjective exercise, misclassification of assaults is not necessarily

10

error.  Beyond this subjective source of variance, the UCR tolerates and the FBI would expect some rate of objective error, even when the factors of classification are static.  Penal Code section 13020 merely requires the LAPD to install and maintain records for the correct reporting of statistical data, which is exactly what happened here.  Carranza, using the crime reports installed and maintained by the LAPD, could correctly identify those assaults that had been misclassified for purposes of reporting statistical data to the FBI.  She did not claim that the crime reports themselves were missing or that they were falsified or inaccurate.  Her complaint was that the LAPD misclassified crimes when it converted the underlying crime reports into statistical data using the criteria set forth by the UCR's manual and then failed to correct those errors.  As such, Carranza cannot rely on Penal Code section 13020 to show that she reasonably believed the misclassifications and failure to correct reporting errors constituted illegal activity when she utilized LAPD's records to determine the accuracy of the data.

Carranza relies on *Ross v. County of Riverside, supra*, 36 Cal.App.5th 580 to assert that her reasonable belief of illegal activity was sufficient to establish she engaged in protected activity under section 1102.5 irrespective of her failure to identify a specific statutory or regulatory violation.  However, *Ross* held that, to have a reasonably based suspicion, the employee must be able to point to some statute, rule, or regulation which may have been violated.  (*Id.* at p. 592.)  For example, the employee in *Ross*, a deputy prosecutor, disclosed information to his superiors that his office would be unable to prove a particular murder case beyond a reasonable doubt.  The prosecutor told his superiors they lacked probable cause to continue prosecuting the case

11

because of a coerced confession, exculpatory DNA evidence, and a recorded confession by another individual close to the criminal defendant. After the prosecutor recommended dismissing the case, he was constructively terminated. The trial court granted summary judgment in favor of the employer and the Court of Appeal reversed, concluding that the prosecutor did not need to identify a specific statutory violation but could rely on his belief that continued prosecution would violate the criminal defendant's due process rights as well as a prosecutor's ethical obligations under state law. (*Id.* at pp. 592–593.)

Unlike *Ross*, where the whistleblower could point to numerous constitutional principles, statutes, and rules of professional conduct to ground his suspicions of illegal activity, Carranza cannot show that the misclassifications violated any law. At most, the misclassifications ran afoul of the criteria set forth in the UCR's manual, which itself acknowledges that the classification of assaults is difficult and offers additional guidance to law enforcement agencies to ensure accurate reporting.

This case is akin to *Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809 and *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922 where employees conflated their reports of internal personnel issues and policy disputes with protected whistleblowing activity. In *Mueller*, a firefighter with the County of Los Angeles Fire Department sued for whistleblower retaliation. Mueller claimed his employer retaliated against him for voicing his opinion about the transfer of captains out of a specific fire station and for filing formal grievances about his transfer from station to station. (*Id.* at p. 819.) Like Carranza, Mueller asserted that section 1102.5 only

12

required that the employee have reasonable cause to believe that the information he disclosed to a government or law enforcement agency disclosed a violation of a statute, rule, or regulation. However, *Mueller* concluded that the plaintiff merely reported violations of his employer's internal policies which did not merit whistleblower protection. (*Id*. at p. 822.) "[M]atters such as transferring employees, writing up employees, and counseling employees are personnel matters." (*Ibid*.) " 'To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected "whistleblowers" arising from the routine workings and communications of the job site.' " (*Ibid*.)

Likewise, in *Carter v. Escondido Union High School Dist*., *supra*, 148 Cal.App.4th at page 925, a teacher sued the school district for whistleblower retaliation when his employer terminated him after he reported that a football coach recommended a nutritional supplement to a student athlete. A jury found in favor of the teacher and the Court of Appeal reversed, concluding that the teacher's disclosure was not a protected activity under section 1102.5 but rather a routine " 'internal personnel disclosure' " over a disagreement about the treatment of student athletes. (*Id*. at p. 934.)

Like *Mueller* and *Carter*, the reports here are limited to disputes over internal personnel issues and compliance with interagency policies. Carranza's reports did not implicate a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. Therefore, Carranza was not entitled to whistleblower protection

13

under section 1102.5 and summary judgment was properly granted.  Because we conclude that Carranza cannot establish that she was engaged in protected activity as a matter of law, we do not address her remaining contentions.  (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19.)

## DISPOSITION

The judgment is affirmed.  The City of Los Angeles is awarded its costs on appeal.

NOT TO BE PUBLISHED.


WINDHAM, J.*


We concur:


LAVIN, Acting P. J.


EGERTON, J

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.