Filed 2/27/24  Singh v. County of Santa Clara CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BINDYA H.S.B. SINGH, | H049688 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 2013-1-13-CV-244607) |
| v. | |
| COUNTY OF SANTA CLARA, | |
| Defendant and Respondent. | |

Dr. Bindya Singh sued Santa Clara County in 2013 for retaliation and discrimination after her position as a neonatologist at the County's Valley Medical Center hospital (VMC) was eliminated.  Following this court's reversal of the trial court's order granting summary judgment in favor of the County (H043741), the matter proceeded to trial in 2021 on Singh's two remaining causes of action under the Fair Employment and Housing Act (FEHA) and Labor Code section 1102.5.[1]

The trial court granted the County's motion for nonsuit as to Singh's section 1102.5 cause of action, holding that FEHA precludes bringing a race-based retaliation claim under section 1102.5 predicated on identical facts, and that the evidence could not support a jury verdict in Singh's favor on her other section 1102.5 claims.  The FEHA cause of action proceeded to the jury, which returned a verdict in favor of the County.

On appeal, Singh argues FEHA does not preclude her race-based section 1102.5 claim, and the evidence was sufficient to support a verdict in her favor on the remaining

---

[1] Undesignated statutory references are to the Labor Code.

claims under that statute. She also contends the trial court committed various evidentiary errors that necessitate reversal and retrial of her FEHA cause of action.

We determine that, because Singh has failed to demonstrate any prejudice, we need not decide whether the trial court erred in ruling that FEHA precludes a duplicative section 1102.5 cause of action. We also conclude the evidence would not support a jury verdict for Singh on her other section 1102.5 claims, so the trial court properly granted the County's motion for nonsuit. Lastly, we reject Singh's claims of evidentiary error. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Singh's employment at VMC

Singh became a board-certified neonatologist and pediatrician in 1997. After practicing elsewhere for 10 years, she was hired as a physician in May 2007 in VMC's department of pediatrics. Singh was assigned to VMC's neonatology unit, which specializes in care for critically ill or premature infants, particularly in the neonatal intensive care unit (NICU). During her tenure at VMC, Singh reported to Dr. Balaji Govindaswami, division chief of neonatology and director of the NICU.

### B. Conduct allegedly giving rise to retaliation

Singh claims VMC and Govindaswami retaliated because of her opposition to race discrimination and her disclosure of other legal violations by Govindaswami. She identifies several specific incidents she contends gave rise to the retaliation. We summarize the trial evidence regarding those incidents below.[2]

___

[2] In her opening brief on appeal, Singh makes numerous factual assertions that are completely unsupported by any citations to the record. We disregard all such assertions. "Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 (*City of Santa Maria*).) "Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the (continued)

### 1. *Masimo stock and diversion of business from Singh's former hospital*

Singh contends that she objected to Govindaswami diverting VMC resources to invest in equipment developed by a company in which Govindaswami owned stock. Specifically, she testified that, while on a flight to a work conference in 2007 or 2008, Govindaswami told her he had asked his friends and family to purchase stock in a company called Masimo, which produces pulse oximetry equipment, at the same time he was promoting the company's equipment at VMC. She claimed Govindaswami also suggested that she personally invest in Masimo. During the same conversation, Govindaswami allegedly told Singh he wanted her to help divert business from her former employer, Good Samaritan Hospital.

After they returned to the office, Singh told Govindaswami that she was not comfortable with what he had said and she was "not willing to participate." According to Singh, Govindaswami told her that if she did not do as he said, he would "not have a position for [her]" at VMC.

Govindaswami testified he never told Singh she should invest in Masimo or that he had told his family and friends to purchase Masimo stock. He also testified that, although he did own Masimo stock, he properly disclosed his ownership and recused himself from VMC decisions regarding selection of medical equipment possibly involving Masimo.

### 2. *Colleague's clinical study at UCSF*

In 2009, Dr. Priya Jegatheesan, another neonatologist at VMC, participated in a clinical study at UCSF. Singh contends that Jegatheesan, a junior neonatologist, was not eligible to participate in the study, and that "doctors with seniority had to go through a rigorous approval process" for such programs. Singh was concerned that the purpose of the study was "to support Dr. Govindaswami's publications and lobbying activities to

---

conclusions [s]he wants us to adopt." (*Ibid*., citing *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1, Cal. Rules of Court, rule 8.204(a)(1)(B).)

promote Masimo pulse oximeters." Singh testified that she complained about Jegatheesan's participation in the clinical study to Dr. Stephen Harris, chair of VMC's pediatrics department, objecting to what she characterized as the misuse of County funds.

### 3. Anti-white discrimination

Singh testified to multiple instances of anti-white racial discrimination by Govindaswami. According to Singh, she sought to take a particular nurse educator to another hospital to teach in a videotaped neonatal resuscitation program, but Govindaswami objected, telling her to "make videos with colored people," and that "there were enough white people in the videos." Later, in 2010, Govindaswami allegedly told Singh that he intended to replace the nurse educator's staff position with a "colored person."[3] Singh testified that she objected to Govindaswami, who expressed his displeasure with her through his mannerisms, behavior and conduct: "he suddenly looked at me very angrily, dismissed me and walked away abruptly."

In another incident in 2007 or 2008, Singh alleges, Govindaswami accused VMC's incoming chair of obstetrics and gynecology (OBGYN), Dr. James Byrne, of being a racist, and told Singh that he "did not want a white man in power." Singh testified that she knew Byrne was not a racist, having worked with him at their previous hospital, and having seen him work with people of color, including herself. She shared her thoughts with Govindaswami, who nevertheless announced at a subsequent VMC staff meeting that there were rumors Byrnes was a racist.

Sometime thereafter, Singh testified, Govindswami approached her in a corridor and said, "I'm not happy with you…. [i]t's going to be difficult to work with you if you oppose my plans. I did not want a white man in power." Singh also testified that she e-mailed Byrne regarding the incident, supporting his candidacy and debunking the rumor.

---

[3] Singh does not specify when the initial incident allegedly occurred.

4

Byrne testified that he never received any such e-mail from Singh. He acknowledged that Govindaswami had informed him about an accusation made by a physician at a different hospital that Byrne was racist. However, Byrne never heard Govindaswami or anyone else propagate that rumor and Byrne testified that Govindaswami supported his candidacy for the OBGYN chair.

Two other witnesses—Dr. Christina Anderson and Dr. Brian Scottoline, each of whom is white—corroborated Singh's testimony that Govindaswami favored non-white doctors over white doctors and that Singh stood up for them. Anderson testified, for instance, that she was excluded from certain professional activities by Govindaswami in favor of non-white doctors, despite her qualifications. Similarly, Scottoline testified that he observed Govindaswami treat white doctors and nurses differently than non-whites. In addition, he heard Govindaswami use the terms "Stanford Ivory Tower" and "White Stanford Club," referring to white doctors at VMC who had studied at Stanford.

Govindaswami testified that he never made any of the alleged racist statements.

### 4. *Violation of CCSM standards*

Singh contends that she complained about VMC violating certain NICU staffing requirements set forth in the California Children's Services Manual (CCSM). According to Singh, the CCSM mandates that a certified neonatologist or other physician with specified emergency training for newborns be present in the NICU at all times, and she objected to VMC's failure to adhere to that standard.

At trial, both Anderson and Scottoline testified that they observed Singh complain about the level of staffing of neonatologists during the night shift, and that the NICU needed another neonatologist.

Singh argues that Govindaswami and Harris sought to save costs by having no neonatologist or trained newborn specialist in the NICU at night, and instead "adopted a rule that as long as a [neonatologist] was on call for emergency cases in which a

5

neonatologist was needed, it was sufficient for a hospitalist physician who was not a neonatologist to be present in the hospital at night."

### 5.  Intellectual property theft

In May 2009, Singh co-authored a paper regarding a patient born with a cleft palate, and its association with a particular genetic marker.  Singh was listed as the first author on the paper, along with six other doctors who participated or contributed.

Singh testified that she had discovered the genetic association, and had reached out to Dr. Robert Wallerstein, a geneticist at VMC, and invited him to join in writing the paper.  Singh claimed that Govindaswami "inserted his name" into the paper without justification, and then sent it to be published without her approval.  She objected to this at two different meetings, first with Harris, and then with Harris, Govindaswami and Wallerstein.  According to Singh, her intellectual property had been taken without her consent.  She claimed that Harris responded to her complaint by saying:  "Well, this is a situation where you just have to go with what these other gentlemen are telling you. Just follow what they're saying, you know."

Wallerstein testified that it had been his decision to add Govindaswami as a co-author because he had contributed intellectual material to the paper.  He acknowledged that Singh disagreed and objected to including Govindaswami's name.  Wallerstein offered to remove his own name from the paper or to decline to publish it altogether.

Govindaswami testified that Wallerstein and another doctor had come to him for advice on the paper, and he made certain intellectual contributions in response.  He denied that Singh objected to the inclusion of his name, and testified that she instead had argued with Wallerstein about including a different doctor's name on the paper.

### 6.  HIPAA violation

Singh claims that, when Wallerstein sent the cleft palate paper to the publisher without her knowledge or consent, he included a photograph of the patient in violation of privacy rights.  According to Singh, she objected to inclusion of the photograph because

6

the baby's parents had not consented, and she informed Govindaswami and Wallerstein that they had violated the Health Insurance Portability and Accountability Act (HIPAA). She argues that the "controversy continued to pit Plaintiff against Drs. Wallerstein, Govindaswami and Harris through publication of the paper in September of 2011, and the rancor continued through to the time Plaintiff was terminated."

### 7. *Loss of O'Connor hospital services and resulting layoffs*

In April 2012, VMC sought to renegotiate a contractual arrangement to provide neonatology services to O'Connor Hospital. The County had determined the existing arrangement was no longer financially viable, and notified O'Connor that it could not continue to provide the services without a new agreement that satisfactorily addressed the County's financial concerns.

The County's proposed budget for the ensuing fiscal year anticipated the possible elimination of 3.5 "full-time equivalent" physician position codes (FTE codes) at VMC, each one representing a 40-hour-per-week position, in the event the parties failed to negotiate a new contract. On June 4, 2012, the County initially identified four specific FTE codes at VMC that would be eliminated without a new O'Connor contract: Scottoline, Dr. Glenn DeSandre, Dr. Sunshine Weiss, and Dr. Sudha Narasimhan. If the parties could not negotiate a new contract, those FTE codes—and hence, those doctors' positions—would be eliminated automatically on July 1, 2012, at the beginning of the County's next fiscal year.

On June 25, 2012, O'Connor informed VMC that it had reached an agreement with a different provider, so it would not be able to negotiate a new contract with VMC. As a result, four FTEs would be eliminated within a week.

Singh testified that between April and June of 2012, Govindaswami and Harris had been developing different plans to save the neonatologists' jobs, such as reducing hours, working night shifts in lieu of non-staff doctors, or using FTE codes from retiring physicians. After the O'Connor contract negotiations fell through, Singh became

7

concerned that Govindaswami and Harris were not promoting the plans to the County to save the neonatologists' jobs. On the morning of June 27, 2012, she e-mailed Govindaswami, Harris and the other doctors in the neonatology group, saying she wanted the team to be more proactive in preventing layoffs.

### 8. *Singh and Govindaswami's June 27, 2012, phone call*

Shortly after Singh sent her June 27 e-mail, Govindaswami called her to discuss it, and the two had a 54-minute phone conversation. Singh testified that Govindaswami told her, "[e]veryone is laughing at you" for trying to take a leadership role in preventing layoffs. Singh responded by explaining that she wanted to step in and present the team's plans for saving their jobs because no one else was doing so. Govindaswami told her she did not need to be worried because she was not one of the four doctors whose FTE codes had been identified for elimination by the County. Singh stated that she still wanted to be involved "because I've seen you discriminate and harass my brothers and sisters, and I've seen you do other illegal activities and conduct that I have always reported and wanted to get involved in this because I do not know why you are not presenting these plans."

Singh testified that she specifically mentioned Anderson and Scottoline, noting that they "were continuously being harassed in the meetings," and reminding Govindaswami how many times she had seen him treat them inappropriately. Govindaswami allegedly responded by saying, "Well, I'm the chief. I can do anything," and that Anderson and Scottoline "deserve it." According to Singh, Govindaswami had "already told me he didn't want to select them [to keep their jobs] because they belong to the white club of Stanford."

Singh testified that she also told Govindaswami she was "aware of other illegal conduct." She said she had witnessed his other illegal conduct, had reported it and would not hesitate to expose it further, "because it seemed to me he was trying to push me out of getting involved in preventing layoffs." Govindaswami allegedly responded by saying,

8

"Well, don't worry. I'm going to get these letters [eliminating FTE codes] shredded. I'm getting these letters shredded and no one's going to get laid off."

Singh replied, "Well,… please do the right thing," and "God is watching us all," to which Govindaswami allegedly said, "I don't care about God. I do as I want. And I kick butts as needed."

Govindaswami testified that he did tell Singh during the phone conversation that her name was not among the four doctors identified by the County for layoffs. However, he denied that Singh told him she had seen him harass and discriminate against Anderson and Scottoline. He also denied that he said "everyone is laughing at you," that Singh told him she had witnessed his illegal conduct and would not hesitate to report it further, and that he had said "I don't care about God. I do as I want. And I kick butts as needed."

### C. Layoffs and re-hirings

As noted above, the County initially identified four doctors whose FTE codes would be eliminated: Scottoline, DeSandre, Weiss and Narasimhan. The County's employee services agency initially identified the four doctors and notified Dr. Clifford Wang, VMC's acting chief medical officer. Although the County had prepared letters to the four doctors informing them of the impending layoffs, the letters evidently were never delivered.

Instead, upon receiving the letters, Wang contacted Harris and Govindaswami to discuss how the four doctors had been selected by employee services, and whether the process was fair and appropriate. They learned that employee services had intended to base the selection process on the total numbers of hours of clinical work performed at O'Connor hospital over the previous six months. However, their data was inaccurate, and Harris and Govindaswami did not think that was a fair determinative factor.

Wang, Harris and Govindaswami then discussed the matter with Luke Leung, deputy director of employee services, on June 29, 2012. During that meeting, Leung confirmed that Harris and Govindaswami could provide input into which doctors were

9

released, and he agreed to rescind the original layoff notices. Wang then asked Harris and Govindaswami to name four doctors to be released, using what they believed would be a "fair process."

Wang testified that he directed them to use a number of factors in their decision, such as "professionalism, productivity, special skill sets, et cetera," and empowered them to determine which doctors would be released. Harris and Govindaswami then identified the four doctors to be released: Scottoline, Weiss, Narasimhan and Singh. Harris testified that he and Govindaswami solely used seniority to determine which doctors would be released: "We used last-in and first-out in the division of neonatology… to determine who would be the four who would get the layoffs." Formal layoff notices were delivered to the four doctors on July 2, 2012. Singh's final day was initially identified as July 29, 2012.

On July 18, 2012, VMC re-hired Narasimhan and Weiss, using the remaining 0.5 FTE code—the difference between the four eliminated positions and the 3.5 positions required to be cut from the budget—and a full-time position recently vacated by a retiring pediatrician. Harris testified that Weiss was re-hired because "she was an integral member of the working group that was building our electronic medical record," and Narasimhan was re-hired at half-time "because of her work with the breastfeeding initiative in the newborn nursery and the [NICU]."

### D. Singh's objections

On July 19, 2012, Singh met with Wang at her request, where she asked about the process that resulted in her position being eliminated. During the meeting, Singh shared concerns about the propriety of Govindaswami having been named as a co-author on the cleft palate research paper in 2009.

The same day, Singh wrote a letter to Dr. Jeffrey Smith, the County executive, in which she accused Govindaswami of unethical conduct. Among other things, Singh alleged that Govindaswami had discriminated in his re-hiring decisions, misused County

10

funds by sending Jegatheesan to participate in the clinical study at UCSF, used "threatening and intimidating ways" during meetings, and forced his way into her cleft palate publication "even when he had no significant contribution." Singh met with Smith the next day, where she again accused Govindaswami of unethical conduct.

On July 22, 2012, Singh sent an e-mail to several hundred employees in the NICU, in which she also accused Govindaswami of unethical conduct, including: "orchestrating" the layoffs after losing the O'Connor contract on purpose; creating false accusations in certain personnel files of individuals who speak up; threatening Singh for speaking up against his false accusations that Byrne is a racist and forcing himself on her research paper; and misusing County funds to send Jegatheesan to the clinical study.

The following day, the County informed Singh that her layoff would be suspended pending investigation of her allegations. After the investigation concluded, the County notified Singh on August 16, 2012, that her position would be eliminated as of August 17, 2012.

### E. Complaint

On April 12, 2013, Singh filed the initial complaint in this lawsuit. The operative third amended complaint was filed on September 2, 2014 (complaint), naming VMC and Govindaswami as defendants.[4] The complaint alleged eight causes of action for retaliation, harassment, and discrimination in violation of various statutes. Two causes of action alleged age and religious discrimination against VMC in violation of FEHA; one cause of action alleged harassment based on religion and other grounds against VMC and Govindaswami in violation of FEHA; the remaining five causes of action were against VMC for retaliation in violation of FEHA, Labor Code sections 1102.5 and 6310, Business and Professions Code section 2056, and Health and Safety Code section 1278.5.

### F. Summary judgment and first appeal

---

[4] The County answered on behalf of VMC. We refer to the public agency defendant in the context of the litigation as the County.

Defendants successfully moved for summary judgment or summary adjudication as to all causes of action, and Singh appealed. In an opinion dated July 9, 2018, this court reversed the trial court and remanded with directions to enter a new order (1) denying summary adjudication as to the first cause of action for retaliation in violation of FEHA and the second cause of action for retaliation in violation of Labor Code section 1102.5, and (2) granting summary adjudication as to all the other causes of action. (H043741 at p. 54.)

### G. Trial and nonsuit

Following remand, the matter proceeded to trial on Singh's two remaining causes of action against the County in September and October 2021. The first cause of action alleged that Govindaswami retaliated against her for opposing and threatening to report his FEHA violations, including targeting white employees for mistreatment, and that the retaliation was a motivating factor in the termination of her employment by the County. The second cause of action alleged that she refused to participate in certain activities involving violations of state or federal statutes or which were not in compliance with state or federal rules and regulations and presented improper risks to employee health and safety, and that she complained about these issues to Smith, Harris and Govindaswami. Her actions, she alleged, were contributing factors in the County's decision to terminate her employment.

After the close of Singh's evidence, the County orally moved for nonsuit on multiple grounds. The trial court solicited briefing from the parties and heard argument on the motion on October 25, 2021.

The next day, the court issued its order granting the County's motion in part and denying it in part (order). The court denied the motion as to Singh's FEHA retaliation claims based on her alleged complaints that Govindaswami discriminated against "white" neonatologists and that, in retaliation for such complaints, she was selected for layoffs before July 2, 2012, and subsequently not re-hired in July 2012.

12

The court granted the remainder of the motion on two grounds. First, it held that Singh's race-based retaliation claims pursuant to section 1102.5 were identical to her FEHA claims, so that allowing her simultaneously to pursue remedies under section 1102.5 would: (1) negate the requirement of exhausting administrative remedies prior to filing a claim for retaliation under FEHA, and (2) allow Singh to circumvent the higher burden of proof requirements for proving a claim under FEHA.

The trial court also rejected Singh's related argument that the "law of the case" doctrine precluded the court from making such a ruling. According to Singh, this court had already determined as a matter of law—in the previous opinion in H043741 reversing the trial court's grant of summary judgment—that disclosure of FEHA violations can be simultaneously cognizable under section 1102.5. The trial court held there was no record that this court "considered, or was required to consider, whether as a matter of law a plaintiff can circumvent the procedural and burden of proof requirements for proving a violation of FEHA by asserting the same facts, employment acts and remedy under the label of Labor Code section 1102.5."

Second, the trial court held there was no evidence to support a jury verdict in Singh's favor based on her remaining non-race-based section 1102.5 claims. Those claims included: (1) authorization for Jegatheesen to do the clinical study at UCSF; (2) submission of the cleft palate research paper with Govindaswami's name as a co-author and inclusion of the child's photo with the draft article; (3) NICU staffing concerns; (4) Govindaswami's ownership of Masimo stock and alleged participation in any decision to purchase Masimo pulse oximeters in 2007 or 2008; and (5) any vague reference by Singh to "other illegal acts" in her June 27, 2012 phone conversation with Govindaswami, "[a]s insufficient to create a casual link between these specific activities and the selection of Dr. Singh for lay-off."

In connection with the order, the trial court instructed the jury that such claims were "no longer part of this case, and they will not be part of the evidence that you will be asked to consider."

After entry of the order, the trial proceeded on Singh's FEHA cause of action.[5]

### H. Verdict, judgment and appeal

The matter was submitted to the jury on October 27, 2021. The jury returned its verdict the following day, finding that Singh's opposition to discrimination against white employees by Govindaswami was not a substantial motivating reason for the County's decision to terminate her.

Judgment was entered in the County's favor on December 13, 2021. Singh timely appealed.

## II. DISCUSSION

Singh argues on appeal that: (1) the trial court erred by deciding as a matter of law that a party may not simultaneously maintain causes of action for retaliation for opposing race discrimination under FEHA and section 1102.5; (2) the trial court's order violated the doctrine of "law of the case" because it contradicted this court's ruling in the previous appeal, H043741; (3) the trial court erroneously granted nonsuit as to her remaining section 1102.5 claims because "there was more than sufficient evidence for a reasonable juror to find in [her] favor on each of these grounds"; and (4) the trial court made numerous erroneous evidentiary rulings which tainted the trial to such an extent that judgment on the FEHA cause of action must also be reversed.

We address these arguments in turn below.

---

[5] Singh also filed an emergency petition for writ of mandate in this court, seeking an order directing the trial court to vacate its order granting the motion for nonsuit in part. (H049495.) This court denied the petition on October 26, 2021.

14

### A. Standards of review

"In reviewing a judgment of nonsuit, 'we must view the facts in the light most favorable to the plaintiff.' " (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347 (*O'Neil*), quoting *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.) " '[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, ... indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor...." [Citation.] The same rule applies on appeal from the grant of a nonsuit. [Citation.]' " (*Ibid.*)

"An appellate court's review of a judgment after the grant of a nonsuit 'must be based on the whole record, not just excerpts chosen by the appellant.' " (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 124 (*Ritschel*), quoting *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.)

Where a motion for nonsuit raises issues of law, such as statutory interpretation, we " 'review the rulings on those motions de novo, employing the same standard which governs the trial court.' " (*Lacagnina v. Comprehend Systems, Inc.* (2018) 25 Cal.App.5th 955, 967-968, quoting *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.)

Separately, we review a trial court's evidentiary decisions for an abuse of discretion. (*Physicians Committee for Responsible Medicine v. Los Angeles Unified School District* (2019) 43 Cal.App.5th 175, 182; *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446.)

Lastly, even where trial court error exists, it "is not grounds for reversal unless it is probable the error prejudicially affected the verdict."  (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)  The California Constitution mandates that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  (Cal. Const., art. VI, § 13; see also *Robert v. Stanford University* (2014) 224 Cal.App.4th 67, 72, quoting Code Civ. Proc., § 475 [trial court error reversible only where it affects substantial rights of the parties and "a different result would have been probable if such error ... had not occurred or existed"].)

Reversible error "requires demonstration of prejudice arising from the reasonable probability the party 'would have obtained a better outcome' in the absence of the error." (*Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 20.)

An appellant has the burden of affirmatively demonstrating prejudicial error. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)  The failure to provide an explicit prejudice analysis constitutes waiver.  (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106 (*Paterno*).)

### B.  Analysis

#### 1.  FEHA and section 1102.5

As summarized above, the trial court held that allowing Singh to pursue remedies simultaneously under FEHA and section 1102.5 would:  (1) negate the requirement of exhausting administrative remedies prior to filing a claim for retaliation under FEHA, and (2) allow Singh to circumvent the higher burden of proof requirements for proving a claim under FEHA.

16

We begin with a brief overview of the two statutory provisions at issue before addressing Singh's arguments.

### a. FEHA

FEHA prohibits discrimination against an employee because of the employee's race, among other things. (Gov. Code, § 12940, subd. (a).) FEHA further provides in Government Code section 12940, subdivision (h) that it is unlawful for an employer to discharge or otherwise discriminate against a person "because the person has opposed any practices forbidden under [FEHA]." The California Supreme Court has instructed that Government Code section 12940, subdivision (h) therefore "forbids employers from retaliating against employees who have acted to protect the rights afforded by [FEHA]." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1035 (*Yanowitz*).)

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.)

An employee has engaged in a protected activity under FEHA if the employee "has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1043.) Although the employee need not explicitly inform the employer that its conduct was discriminatory, the employer must know that the employee's opposition was based on the employee's reasonable belief that the employer's conduct is discriminatory. (*Id.* at p. 1046.) "[A]n

17

employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination.  [Citation.]"  (*Id.* at p. 1046.)

To establish the requisite causal link, a plaintiff must demonstrate the discrimination was a substantial motivating factor in the action taken by the employer.  (*Husman v. Toyota Motor Credit Corporation* (2017) 12 Cal.App.5th 1168, 1186, quoting *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 (*Harris*).)

Finally, before bringing a FEHA action, "the employee must exhaust the administrative remedy provided by the statute by filing a complaint with the Department of Fair Employment and Housing (Department) and must obtain from the Department a notice of right to sue…."  (*Romano v. Rockwell International, Inc.* (1996) 14 Cal.4th 479, 492 ["timely filing of an administrative complaint is a prerequisite to the bringing of a civil action for damages under FEHA"]; Gov. Code, §§ 12960, 12965, subd. (b).)

### b.  Section 1102.5

"The Legislature enacted section 1102.5 in 1984 to provide whistleblowers with protection from employer retaliation."  (*People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 722 (*Kolla's*), citing Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 2452 (1983–1984 Reg. Sess.) as introduced Jan. 24, 1984, p. 1 [" 'The intent of this measure is to afford employees some minimum protection against retribution by an employer when the employee reports crimes or violations of the law occurring at his or her place of employment.' "].)  "Section 1102.5(b) initially applied only to employees who disclose suspected unlawful activity to a government or law enforcement agency."  (*Kolla's, supra,* 14 Cal.5th at p. 722, citing Stats. 1984, ch. 1083, § 1, p. 3698.)

18

"In 2003, in the wake of a 'recent spate of false business reports and other illegal activity by Enron, WorldCom and others,' the Legislature amended section 1102.5(b) to include several additional employee protections." (*Kolla's, supra,* 14 Cal.5th at p. 723, citing Assem. Com. on Judiciary, Analysis of Sen. Bill No. 777 (2003–2004 Reg. Sess.) as amended May 29, 2003, p. 1 ["amendments provided new antiretaliation protections to workers who refuse to participate in activities that violate the law or who had engaged in protected whistleblowing activity in past employment"].)

"In 2013, the Legislature again amended section 1102.5(b), expanding its protections to include an employee's disclosure made 'to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance.' " (*Kolla's, supra,* 14 Cal.5th at p. 723, citing Stats. 2013, ch. 781, § 4.1; see *id.*, § 5.) "We have repeatedly held that section 1102.5(b) 'reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation.' " (*Kolla's, supra,* at p. 723, citing *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77; *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 709 (*Lawson*); *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287 (*Soukup*).)

The 2003 amendments also added section 1102.6, which provides: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (*Lawson, supra,* 12 Cal.5th at p. 711.)

Causes of action under section 1102.5 therefore are not subject to the same analytical framework as FEHA causes of action, but instead proceed via the two-step

process set forth in section 1102.6. (*Lawson*, *supra*, 12 Cal.5th at p. 707.) "First, it must be 'demonstrated by a preponderance of the evidence' that the employee's protected whistleblowing was a 'contributing factor' to an adverse employment action. [Citation.] Then, once the employee has made that necessary threshold showing, the employer bears 'the burden of proof to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities." (*Id*. at p. 712, quoting § 1102.6.)

### c. *The parties' arguments*

Singh argues that "the law is clear that FEHA does not broadly preempt Labor Code §1102.5." First, she relies on *Rojo v. Kliger* (1990) 52 Cal.3d 65, in which the California Supreme Court considered whether FEHA provides the exclusive remedy for injuries arising from discrimination in employment. (*Rojo, supra*, 52 Cal.3d at p. 73.) The court recognized that FEHA expressly disclaims any intent to repeal other state laws relating to employment discrimination, and reiterated that " 'FEHA was meant to supplement, not supplant or be supplanted by, existing antidiscrimination remedies, in order to give employees the maximum opportunity to vindicate their civil rights against discrimination.' " (*Id*. at pp. 74-75, quoting *State Personnel Board v. Fair Employment & Housing Commission* (1985) 39 Cal.3d 422, 431.)

The court concluded that, "by expressly disclaiming a purpose to repeal other applicable state laws (§ 12993, subd. (a)), we believe the Legislature has manifested an intent to amplify, not abrogate, an employee's common law remedies for injuries relating to employment discrimination. Had the Legislature intended otherwise, it plainly knew how to do so. [Citations.]" (*Rojo, supra,* 52 Cal.3d at p. 75.) Under FEHA, "plaintiffs are free to seek relief for injuries arising from discrimination in employment under *any* state law, without limitation. In sum, we hold that the FEHA does not displace any causes of action and remedies that are otherwise available to plaintiffs." (*Id*. at p. 82.)

20

Singh argues that this court "need look no further than [*Rojo*] to determine that the trial court's theory of preemption, upon which it dismissed Plaintiff's claim of retaliation for disclosing race discrimination under Labor Code §1102.5, was erroneous."

Second, Singh argues that the trial court's exhaustion of administrative remedies theory lacks merit. The trial court held that allowing a party simultaneously to bring a claim under section 1102.5 at the same time it brings a FEHA claim "would negate" FEHA's exhaustion requirement, which does not apply to section 1102.5 claims. Singh argues that the trial court's logic is flawed because "any party who could *simultaneously* pursue such claims must have *ipso facto* satisfied FEHA's administrative remedies requirement." In addition, she argues, because she satisfied FEHA's exhaustion requirement in this case, the issue of whether permitting her to pursue her section 1102.5 cause of action would negate FEHA's exhaustion requirement "is not a question that needs to be answered in this appeal."

Third, Singh argues the trial court's "higher burden of proof" argument lacks merit. As summarized above, under FEHA a plaintiff must demonstrate the discrimination was a substantial motivating factor, while under section 1102.5, a plaintiff must only show that the protected whistleblowing was a "contributing factor" to the adverse employment action. According to Singh, the fact that she would have to meet a lower burden of proof under the section 1102.5 cause of action "shows that the Legislature, in enacting Labor Code §1102.5 in 1984, *expanded* the rights and remedies available to those in Plaintiff's situation beyond what they were under FEHA."

The County argues the trial court did not actually rule that FEHA precludes Singh's race-based section 1102.5 cause of action because it is predicated on the same facts as her FEHA cause of action. Instead, the County contends that the trial court correctly ruled Singh could not base her section 1102.5 cause of action on an alleged violation of FEHA itself. The County argues that ruling was correct for numerous

21

reasons, including various grounds not specified below in its nonsuit motion or the trial court's order.

As we explain in the following section, we need not decide this issue because, even if the trial court did err in ruling that FEHA precludes Singh's race-based section 1102.5 cause of action, Singh has failed to demonstrate that the error was prejudicial.

### d. Singh has failed to demonstrate prejudice

As noted above, an appellant bears the burden of demonstrating prejudice. (*Paterno, supra,* 74 Cal.App.4th at p. 106.) A reviewing court cannot assume prejudice and will not assist an appellant by "furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 (*Polisso*).) An appellate court's duty to examine the entire cause to determine whether an error was prejudicial "arises when and only when the appellant has fulfilled [its] duty to tender a proper prejudice argument." (*Paterno, supra*, at p. 106.) "Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in [its] brief exactly how the error caused a miscarriage of justice." (*Ibid.*)

Singh makes only a cursory argument that the asserted trial court error here was prejudicial. The entirety of her argument consists of the following: "The trial court's error was prejudicial. In *Alamo v. Practice Management Information Corp*. (2013) 219 Cal.App.4th 466, 483, a jury verdict in favor of a FEHA plaintiff was reversed and remanded because the court had given erroneous instructions as to the 'substantial motivating reason' test. This case is analogous. Here, the erroneous dismissal of Plaintiff's Second Cause of Action deprived plaintiff of the benefit of the lower, 'contributing factor' instruction that should have been given to the jury, requiring reversal."

This falls well short of the requirement to spell out *exactly how* the error caused a miscarriage of justice, or that it is reasonably probable a result more favorable to her

22

would have been reached in the absence of the error. *(Paterno, supra*, 74 Cal.App.4th at p. 106.) First, we find Singh's reliance on *Alamo* unpersuasive. In that case, plaintiff sued her former employer, alleging pregnancy discrimination in violation of FEHA, among other claims. (*Alamo, supra*, 219 Cal.App.4th at p. 470.) Although the employer presented evidence that it terminated the plaintiff due to poor work performance and insubordination, the jury was instructed that it could find for the plaintiff if her pregnancy was "a motivating reason" for the termination, and the jury found in her favor. (*Id*. at pp. 471-473, 478.) The employer appealed, arguing the trial court erred by instructing the jury that plaintiff had to prove her pregnancy-related leave was a "motivating reason" for her termination. (*Id*. at p. 469.) The court of appeal agreed that the trial court erred by instructing the jury with the improper standard, rather than the proper "substantial motivating" reason standard for FEHA claims. (*Id*. at pp. 469-470.)

Further, the court of appeal held that the error was prejudicial because "the proper standard of causation in a FEHA discrimination or retaliation claim is not "a motivating reason," as stated in the instructions, but rather "a substantial motivating reason," as set forth in [*Harris*, *supra*, 56 Cal.4th 203]." (*Alamo, supra,* 219 Cal.App.4th at p. 483.)

However, the court did not provide any analysis or discussion of prejudice that is applicable or instructive here. Because the relevant question in each case is whether it is reasonably probable the appellant would have obtained a better result absent the error—given the record in that particular case—the mere fact prejudice was established in one instance does not compel the same result in another.

Moreover, as there is no suggestion the error in that case was prejudicial *per se*, it appears the court in *Alamo* determined the error was prejudicial based on its review of the entire record. To the extent *Alamo* did not do so, but instead held that the mere existence of a different standard of causation than the one considered by the jury compels reversal without consideration of the evidence, we do not agree. Although the trial court's ruling here did prevent Singh's race-based section 1102.5 claim—and its "contributing factor"

23

standard—from going to the jury, that fact by itself does not establish prejudice, especially in light of the verdict in the County's favor on the FEHA claim for race-based retaliation. Instead, the evidence must show it is reasonably probable that, notwithstanding the verdict on the FEHA retaliation claim, the jury would have returned a verdict in Singh's favor on a similar section 1102.5 claim. If an examination of the record here might demonstrate such reasonable probability, Singh has failed to undertake it and we will not "act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Polisso, supra*, 139 Cal.App.4th at p. 963, citing *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 544-546.)

Because Singh has failed to establish prejudice, her claim of error fails.[6]

### 2. Remaining section 1102.5 claims

With respect to Singh's additional section 1102.5 claims, the trial court ruled there was no evidence to support a jury verdict in Singh's favor. Those claims included: (a) authorization for Jegatheesen to do the clinical study at UCSF in 2009; (b) submission of the cleft palate research paper with Govindaswami's name as a co-author and inclusion of the child's photo with the draft article; (c) NICU staffing concerns in 2007; (d) Govindaswami's ownership of Masimo stock and alleged participation in any decision to purchase Masimo pulse oximeters in 2007 or 2008; and (e) any vague reference by Singh to "other illegal acts" in her June 27, 2012 phone conversation with Govindaswami, "[a]s insufficient to create a casual link between these specific activities and the selection of Dr. Singh for lay-off."

Singh argues on appeal that "there was more than sufficient evidence for a reasonable juror to find in Plaintiff's favor on each of these grounds." She claims that "the history of her confrontation and complaints to and about Dr. Govindaswami over the

---

[6] For the same reason, we need not reach Singh's argument that the trial court's ruling on this issue was contrary to our prior decision in H043741, pursuant to the "law of the case" doctrine.

years, and Dr. Govindaswami's history of warning and occasionally threatening her with losing her job for opposing him, was significant enough that both Plaintiff and Dr. Govindaswami were acutely aware of what she meant, in the tense phone call on June 27, 2012, when she referred to 'other illegal conducts, that I have reported that [sic] and will not hesitate to expose further.' "

As a threshold matter, Singh arguably has waived these points by failing to support them with reasoned argument and citations to the record. (*City of Santa Maria, supra,* 211 Cal.App.4th at p. 287; *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).) In the argument section of her opening brief, Singh does not include a single citation to the record on these issues. Nor does she individually address the five distinct claims for which the trial court held there was insufficient evidence to support a verdict in Singh's favor. Instead, she only generally references her June 27, 2012, phone call with Govindaswami.

Nevertheless, Singh did include arguments and citations to the record, to varying degrees, elsewhere in her opening brief and in her reply brief. In light of that, and our duty to review the entire record after the grant of a nonsuit, we elect to address these arguments here, except where otherwise indicated. (*Ritschel, supra,* 137 Cal.App.4th at p. 124.)

Viewing the facts in the light most favorable to Singh and indulging every legitimate inference in her favor, we conclude the evidence would not support a jury verdict for Singh on these claims. (*O'Neil, supra,* 53 Cal.4th at p. 347.) We address them in turn.

### a. *Colleague's clinical study at UCSF*

Singh argues that Jegatheesan, the junior neonatologist at VMC, was not eligible to participate in the clinical study at UCSF, and that "doctors with seniority had to go through a rigorous approval process" for such programs. She testified that she

25

complained to Harris in 2009 about the misuse of County funds in connection with the study.

As we have stated, to establish a prima facie case of retaliation under section 1102.5, " ' " 'a plaintiff must show that she engaged in protected activity, that she was thereafter subjected to adverse employment action by her employer, and there was a causal link between the two.' " ' [Citation.]" (*Soukup, supra,* 39 Cal.4th at pp. 287-288.)

Here, there is no evidence that Singh engaged in a protected activity. This element requires a "reasonable belief" by the employee that the disclosed information constituted a "violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (*Carter v. Escondido Union High School District* (2007) 148 Cal.App.4th 922, 933 (*Carter*); § 1102.5, subs. (b), (d), (e).)[7] The record is devoid,

---

[7] As we explained in our decision in H043741, section 1102.5 was amended after the time of Singh's employment, to expand the scope of legal violations to include "a violation of or noncompliance with a local, state, or federal rule or regulation." (H043741 at p. 40, fn. 2.)

Former section 1102.5 provided in part: "(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. [¶] (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. [¶] . . . [¶] (e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivision[] . . . (b)." (Stats. 2003, ch. 484, § 2.)

Currently, section 1102.5 states in part: "(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation . . . . [¶] (c) An employer, or any person acting on behalf of the employer, shall not retaliate (continued)

26

however, of "anything that would support a conclusion that [Singh's] belief was reasonable" that sending Jegatheesan to the clinical study at UCSF constituted a violation of any law or regulation. (*Carter, supra,* 148 Cal.App.4th at p. 933.) In *Carter*, the court held that the information disclosed by the plaintiff—recommendation of a protein shake to a student athlete by an athletic coach—was not whistle-blowing under section 1102.5, "but rather a routine 'internal personnel disclosure' that was, at its core, a disagreement between the football and basketball coaches about the proper advice to give to student athletes." (*Id.* at p. 934; see also *Patten v. Grant Joint Union High School District* (2005) 134 Cal.App.4th 1378, 1385, disapproved of on other grounds in *Lawson, supra*, 12 Cal.5th 703 ["To exalt these exclusively internal personnel disclosures with whistle[-]blower status would create all sorts of mischief […and] thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistle[-]blowers' arising from the routine workings and communications of the job site"].) Similarly, here, the evidence shows that Singh's objection constituted a routine personnel matter rather than any legal violation. Notably, Singh has not identified any particular law or regulation she believed was violated by sending Jegatheesan to the clinical study program.[8]

---

against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. [¶] . . . [¶] (e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivision[] . . . (b)." (*Id.*, § 1102.5, subds. (b), (c) & (e).)

We need not decide whether the version of the statute that was in effect during Singh's employment, or after her employment ended, applies to the claims in this case. Under either version we determine there is no evidence in the record to support a jury verdict in Singh's favor on these claims.

[8] Nor does Singh's objection to Harris in 2009 constitute a "disclosure" under the statute. On the contrary, the evidence shows Jegatheesan's involvement in the clinical study was already publicly known at VMC. (See, e.g., *Kolla's, supra,* 14 Cal.5th 719 (continued)

27

### b. *Violation of CCSM standards*

Singh claims she complained about VMC violating NICU staffing requirements set forth in the CCSM. Specifically, she contends the CCSM requires that a certified neonatologist or other physician with specified emergency training for newborns be present in the NICU at all times, and she objected to VMC's failure to adhere to that standard.

As with Singh's objections to Jegatheesan's involvement in the clinical study at UCSF, though, there is no evidence in the record that VMC was violating any staffing requirements in the NICU—accordingly, there is no evidence that Singh had a reasonable belief there was a violation of any law or regulation. (*Carter, supra,* 148 Cal.App.4th at p. 933.) Singh testified only that she "had concerns" about whether the staffing was adequate and complied with CCSM standards.

Singh also argues that Govindaswami and Harris sought to save costs by having no neonatologist or trained newborn specialist in the NICU at night, and instead "adopted a rule that as long as a [neonatologist] was on call for emergency cases in which a neonatologist was needed, it was sufficient for a hospitalist physician who was not a neonatologist to be present in the hospital at night." However, she cites no evidence in support of that assertion, which we therefore disregard. (*City of Santa Maria, supra*, 211 Cal.App.4th at p. 287.)

### c. *Intellectual property theft and HIPAA violation*

Singh claimed Govindaswami "inserted his name" into her cleft palate research paper without justification, and then sent it to be published without her approval, which constituted theft of her intellectual property.

---

[holding that although disclosed information does not need to be unknown *to the recipient*, affirming that "disclosure" means to make something openly known or "open [something] up to general knowledge"].)

As with her other objections, though, the record is devoid of evidence that Singh had a "reasonable belief" there had been a "violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (*Carter, supra,* 148 Cal.App.4th at p. 933.) Although she testified that she believed her intellectual property had been stolen, she has not identified any evidence to support a conclusion that such belief would have been reasonable. On the contrary, the evidence suggests only that the disagreement over co-authorship constituted the type of internal personnel matters that do not rise to whistle-blower status. (*Id*. at p. 934.)

Singh also claims that Wallerstein's inclusion of a photograph with the cleft palate paper violated a patient's privacy rights. However, she failed to support the arguments in her opening brief with any citations to the record. We consider the arguments waived on appeal. (*City of Santa Maria, supra*, 211 Cal.App.4th at p. 287.)

### *d. Masimo stock*

Singh claims Govindaswami told her he had asked his friends and family to purchase stock in Masimo, and suggested that she do so as well, at the same time he was promoting the company's equipment at VMC. Singh testified she told Govindaswami that she was "not comfortable with some of the things I heard and I was not willing to participate."

Even giving this evidence all the value to which it is legally entitled and indulging every legitimate inference in Singh's favor, we are unable to conclude that it would support a jury verdict in Singh's favor. (*O'Neil, supra,* 53 Cal.4th at p. 347.) First, Singh did not testify that she told Govindaswami she was "not comfortable" with anything in particular, but rather only with "some of the things I heard." Similarly, she did not specify what she was unwilling to participate in. Singh had also testified that Govindaswami told her on the airplane that he brought her to VMC to divert business from her former employer. Even accepting Singh's testimony as true, and disregarding

29

conflicting evidence, it does not demonstrate that she objected to anything having to do with Govindaswami's actions regarding Masimo.

Second, Singh's objections to Govindaswami did not communicate a belief on her part that Govindaswami was engaged in any illegal activities. Instead, she merely said she was not comfortable with them and would not participate. There is no evidence that Govindaswami was aware Singh believed he was violating a law or regulation—for that reason, there is no evidence that Govindaswami retaliated against Singh because of these objections. " 'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in a protected activity.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 [without knowledge that applicant had filed a grievance against university, defendants could not have acted in retaliation for appellant's filing of grievance].)

### e. Phone call with Govindaswami

Lastly, Singh contends that her reference to "other illegal conducts" during her June 27, 2012, phone call with Govindaswami was not too vague to create a causal link.

As we have explained, though, there is no evidence in the record that Singh had a reasonable belief that the referenced activities themselves constituted "illegal conduct," or that Govindaswami knew she had such a belief. For that reason, it is immaterial whether her reference to them in the phone call was vague or not.

### 3. Evidentiary rulings

Singh argues that the trial court's "numerous erroneous evidentiary rulings and grant of nonsuit tainted the trial to such an extent that judgment on the FEHA cause of action must also be reversed."

First, she argues: "In ruling on Defendant's Motion in Limine No. __, [sic] the Court erroneously ruled that, because physicians were at-will employees, Plaintiff could not offer into evidence the Memorandum of Understanding (MOU) between VMC and its Valley Physician's Group (VPG) collective bargaining unit." As support, she cites to a

single page of trial testimony by Harris, where he stated that he was currently the chair of VPG, which was formed around 2010 as an independent collective bargaining unit. Nothing in the cited testimony refers to an MOU or a ruling on a motion in limine.

Singh has failed to support her argument with adequate citations to the record and we consider it waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785, citing *Stanley, supra,* 10 Cal.4th at p. 793 [where appellant fails to support a point "with reasoned argument and citations to authority, we treat the point as waived"].)

Second, Singh argues the trial court erroneously granted the County's motion in limine to exclude testimony by her human resources expert, Maureen Clark. However, the record reflects that the court only tentatively ruled that it was inclined to exclude portions of Clark's proffered testimony: "[T]he tentative of the Court is going to be to [exclude] all of that. I say 'tentative' because I want to give counsel for plaintiff the opportunity to point me to other portions of [Clark's] deposition…."

Singh was expressly afforded the opportunity to address the trial court's tentative ruling, but the record does not indicate that she did so. We consider the issue forfeited. (*People v. Holloway* (2004) 33 Cal.4th 96, 133 ["tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself"], citing *People v. Carpenter* (1999) 21 Cal.4th 1016, 1047.)[9]

---

[9] Singh also argues that the trial court improperly instructed the jury that it was not to consider the evidence of the non-race-based section 1102.5 claims; the court improperly struck her testimony seeking to elaborate on her June 27, 2012, phone call with Govindaswami; and that the court "aggressively sustained" the County's objections, often erroneously. We find the arguments lack merit and Singh failed to support them with proper citations to the record and legal authority.

### III.  DISPOSITION

We affirm the judgment.  In the interests of justice, the parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

_____
Wilson, J.


WE CONCUR:




_____
Danner, Acting P. J.




_____
Bromberg, J.




*Singh v. County of Santa Clara*
H49688